**Jimmy Lang WATSON, Plaintiff,**

v.

**The CITY OF SALEM, a municipal corporation of the State of New Jersey; the City of Salem Police Department; Leon F. Johnson, Mayor; and Harold G. May, Chief of Police, Defendants.**

**No. 94–4191 (JBS).**

United States District Court,
D. New Jersey.

Nov. 9, 1995.

Sylvia E. Hall, Hall & Associates, P.C., Pennsville, New Jersey, for Plaintiff.

David J. Puma, Waters, Sherman & Puma, P.A., Salem, New Jersey, for Defendants.

## OPINION

SIMANDLE, District Judge:

Plaintiff Jimmy Lang Watson filed this action alleging that Defendants, the City of Salem, the Salem Police Department, Salem City Mayor Leon Johnson, and Salem City Police Chief Harold May, unlawfully discriminated against him on the basis of his race.

Plaintiff seeks equitable, declaratory, and injunctive relief on the basis of a variety of federal and state causes of action, including: (1) the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) Fourteenth Amendment Equal Protection, 42 U.S.C. §§ 1981a and 1983; (3) Fourteenth Amendment Procedural Due Process; (4) state law negligent and intentional infliction of emotional distress; (5) state law promissory estoppel; (6) state law public policy; (7) state law invasion of privacy; and (8) state law breach of express and implied contracts. Presently before this court is a motion for summary judgment by all four Defendants pursuant to Fed.R.Civ.P. 56(c), together with Defendants' motion for sanctions under Fed.R.Civ.P. 11.

The principal issue which we must decide is whether Plaintiff, as a matter of law, was barred from being hired as a police officer by virtue of his 1990 conviction for grand larceny in the state of South Carolina, by operation of *N.J.S.A.* 40A:14–122. Because we find, for reasons discussed below, that the statutory bar clearly precludes Plaintiff's police employment and impairs each of his numerous claims at state and federal law, we will grant Defendants' motions for summary judgment and impose Rule 11 sanctions arising from Plaintiff's counsel's unreasonable filing of the complaint.

## I. Factual Background

Plaintiff, Jimmy Lang Watson, an African–American, brings this action against the City of Salem, its Police Department, Mayor, and Police Chief alleging that he was the victim of a plot "based upon deceitful promises base [sic] upon a conspiracy to deny a black male from rightful employment base [sic] upon race." (Plaintiff's Opposition Brief at 10). The allegations of a conspiracy stem from Plaintiff's ill-fated attempt to secure and retain employment as a patrolman with the Salem City Police Department. Underlying Plaintiff's claims is the basic premise that Defendant Salem City Mayor Leon Johnson (hereinafter "Mayor Johnson"), an African–American, and Defendant Salem City Police Chief Harold May (hereinafter "Chief May") sought to hire Plaintiff for a short period of time in order to appease Salem City's minori-

ty community and quickly thereafter, for fraudulent and discriminatory reasons, dismiss him from the force. (Affidavit of Jimmy Watson ¶ 19) (hereinafter "Watson Aff."). Upon Plaintiff's dismissal, Plaintiff asserts that Chief May's son would be hired to fill the position. (*Id.*).

Defendant Leon Johnson, a former Salem City police officer, was elected Mayor of Salem City in 1992. As Mayor, and by virtue of *N.J.S.A.* 40A:61–4(f), he retains control over the Salem City Police Department (hereinafter "S.C.P.D.").[1] Citing a need to fill vacancies on the S.C.P.D., in September 1992, Mayor Johnson decided to hire another police officer for the department to be ready for duty in January 1993. (Affidavit of Leon Johnson ¶ 4) (hereinafter "Johnson Aff."). To do so, Mayor Johnson consulted the eligible candidate list promulgated by the New Jersey Department of Personnel (hereinafter "NJDOP") as required by New Jersey Civil Service Code, *N.J.S.A.* 11A:1–1 *et seq.*, which Salem has adopted. (*Id.* at ¶ 5).

The New Jersey Civil Service Code mandates that the municipal appointing authority, in this instance, Mayor Johnson, select a candidate from the top three names on the list. *See N.J.S.A.* 11A:4–8. In September 1992, it was revealed that Plaintiff was third on the current uncertified (or "roster") list, trailing two caucasian males with superior test scores. (Defendants' Appendix § 1) (hereinafter "Def.App."). All three candidates were contacted for interviews and Mayor Johnson requested that Chief May begin to conduct background investigations on the candidates based upon their employment applications. Although contacted, Plaintiff did not appear for his scheduled interview with Mayor Johnson, but instead, at a later date, visited the Mayor's home to speak with him regarding the job. (Def.Br. at 3; Johnson Aff. ¶ 12).

It is at this visit to Mayor Johnson's home that Plaintiff's alleged conspiracy began to unfold. At that meeting, Mayor Johnson expressed concern over several answers Plaintiff reported on his employment applica-

tion, particularly that he listed a misdemeanor criminal violation that occurred in South Carolina. (Johnson Aff. ¶¶ 12, 17). Plaintiff and the Mayor discussed the matter at length, and Mayor Johnson asserts that he was ultimately assuaged by Plaintiff's assurances that the incident was merely a minor domestic dispute. (*Id.* at ¶ 12). Plaintiff, however, recounts a different interpretation of the meeting at Mayor Johnson's house and alleges that he informed Mayor Johnson of the specifics of "any and all criminal arrest or legal matters prior to [his] application." (Johnson Aff. ¶ 26).

Furthermore, at this meeting, the matter of Plaintiff's age was also discussed. Plaintiff would shortly turn thirty-six years old, and at such time, might be disqualified from being employed as a police officer. *See N.J.S.A.* 40A:14–127. Thus, the appointment and Plaintiff's entry into the police academy, if it were to occur, would have to take place prior to his thirty-sixth birthday. (Affidavit of Harold May ¶ 5) (hereinafter "May Aff."). As a result of this meeting, Mayor Johnson agreed to hire Plaintiff pending acceptable completion of the requisite background check. (Johnson Aff. ¶ 14). Plaintiff was introduced publicly at the October 1, 1992, Salem City Council meeting as the next Salem City police officer, pending satisfactory completion of the background check. (*Id.*).

On or about October 1, 1992, Plaintiff reported to work at the S.C.P.D. and received informal training for approximately one week. (Plaintiff's Appendix § B) (hereinafter "Pl.App."). On or about October 8, 1992, Chief May received the Federal Bureau of Investigation background check of Plaintiff which revealed that in 1990, he was convicted of Grand Larceny in South Carolina, an offense for which he was still serving a sentence of three years probation. (Johnson Aff. ¶ 16; May Aff. ¶ 7). Upon being advised of this report, Mayor Johnson requested that Plaintiff voluntarily remove his name from the list of candidates. (Johnson Aff. ¶ 19). When Plaintiff refused, Mayor Johnson informed him that his appointment was sus-

---

1. *N.J.S.A.* 40A:61–4(f) provides, in relevant part, that: "The mayor shall be the head of the police department and shall have the power to appoint, suspend or remove all employees of the police department."

pended and that he was not to report to the police department any further. Mayor Johnson then informed Plaintiff that he was going to have his name removed from the NJDOP roster. (*Id.* at ¶ 21).

As a result of his dismissal, Plaintiff filed a series of agency actions. Plaintiff appealed Mayor Johnson's decision to remove his name from the NJDOP roster. The NJDOP rejected his appeal and notified Plaintiff of his right to appeal to the New Jersey Merit Systems Board. No appeal was taken from this determination. (Def.App. § 8).

On or about October 14, 1992, Plaintiff filed complaints with the EEOC and New Jersey Department of Civil Rights (hereinafter "NJDCR") alleging that: (1) white police applicants were not subject to similar drug tests; (2) white police applicants were not subject to similar background checks; and (3) white police officers were not fired for offenses on their records. (*Id.* at § 5). On January 14, 1993, the NJDCR held a fact-finding conference at which Plaintiff failed to appear. Subsequently, on February 14, 1994, Plaintiff's NJDCR complaint was dismissed for lack of probable cause. (*Id.* at § 13). Similarly, Plaintiff's EEOC complaint was dismissed on May 31, 1993. (*Id.*).

The following lawsuit ensued.

## II. Plaintiff's Complaint

Plaintiff's complaint seeks legal, declaratory, injunctive, and equitable relief on the basis of numerous federal and state causes of action. For purposes of clarity, each count of Plaintiff's complaint is hereby renumbered and summarized as follows: [2]

1.  Title VII racial discrimination, 42 U.S.C. § 2000e—alleging that Plaintiff was not offered a permanent position on the basis of race;

2.  14th Amendment Equal Protection, 42 U.S.C. § 1981—(same);

3.  Intentional infliction of emotional distress—alleging that Defendant's actions were extreme and outrageous in that Defendants knew Plaintiff had a

"domestic action" on his record prior to his offer of employment;

4.  Negligent infliction of emotional distress—alleging that Defendants breached their duty of care to Plaintiff and caused severe emotional distress;

5.  14th Amendment Equal Protection and Due Process—alleging that Defendants conducted a more extensive background investigation upon Plaintiff than upon similarly police situated officers;

6.  Promissory Estoppel—alleging that Defendants induced Plaintiff into employment and that Plaintiff reasonably relied on Defendants promises;

7.  Breach of an express contract between Plaintiff and the S.C.P.D.;

8.  14th Amendment Equal Protection—alleging that Defendants did not "properly review the domestic dispute in Plaintiff's history;"

9.  Public Policy—alleging that Plaintiff's termination is violative of New Jersey state public policy;

10.  Breach of an implied contract between Plaintiff and the S.C.P.D.;

11.  14th Amendment Equal Protection—alleging that Defendants failed to provide "notice and a pre or post deprivation hearing by an impartial body;"

12.  42 U.S.C. § 1983—alleging that Defendants "had a policy to discriminate against blacks by not offering them employment and by termination of blacks without cause;"

13.  Invasion of privacy—alleging that Defendants "released privileged and confidential employment matters to the public."

## III. Discussion of Law

### A. Ripeness for Decision on Summary Judgment

■ As an initial response to Defendants' motion for summary judgment, Plaintiff as-

---

**2.** In its original form, Plaintiff's complaint is misnumbered, generating confusion among both the parties and the court.

serts that the motion is "inappropriate at this stage of the proceeding" because "affirmative evidence to defeat this motion is within the possession of the defendants which Plaintiff has had [sic] no full opportunity to conduct discovery and is entitled to do such discovery." (Pl.Opp.Br. at 6–7). Defendants counter that over six months had passed between January 19, 1995, the date of entry of Magistrate Judge Joel Rosen's initial Order for Scheduling Conference pursuant to Fed.R.Civ.P. 16, at which time Plaintiff was advised of his obligations under Fed.R.Civ.P. 26, and July 24, 1995, the filing date of the pending motion. (Def.Br. at 13–15). During such time, Defendants assert that Plaintiff's counsel has failed to make any meaningful efforts to conduct discovery and has failed to live up to numerous court mandated obligations. (*Id.*). Furthermore, due to Plaintiff's dilatory approach to discovery and its court mandated obligations in general, Judge Rosen specifically ordered Defendants to file the instant summary judgment motion. (Order by Judge Rosen, dated May 30, 1995). For the following reasons, this court concludes that the instant summary judgment motion is ripe for decision.

At the outset, it is important to note that the court "is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery." *Dowling v. City of Philadelphia*, 855 F.2d 136, 139 (3d Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In order to request that the court withhold decision on a summary judgment motion, the party seeking the delay must file a Rule 56(f) affidavit indicating that more discovery is needed.[3] *Radich v. Goode*, 886 F.2d 1391, 1393–94 (3d Cir.1989) (concluding that an unverified memorandum opposing a motion for summary judgment does not comply with the Rule 56(f) affidavit require-

ment); *Dowling*, 855 F.2d at 139–40. The affidavit must include "what particular information is sought; how, if uncovered it would preclude summary judgment; and why it has not been previously obtained." *Dowling*, 855 F.2d at 140 (citing *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 229–30 (3d Cir.1987)).

The Rule 56(f) affidavit is required " 'to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition.' " *Radich*, 886 F.2d at 1394 (quoting *First Chicago Int'l. v. United Exchange Co. Ltd.*, 836 F.2d 1375 (D.C.Cir.1988)). Thus, Plaintiff's unsworn argument that time for discovery should be extended, without an appropriate Rule 56(f) affidavit, is not sufficient grounds for this court to delay decision on the pending summary judgment motion. *See Radich*, 886 F.2d at 1394–95 ("an [unsworn] statement is lacking both in substance, and in any indicia of evidentiary reliability contemplated by the requirements of Rule 56"); *Township of Wayne v. Messercola*, 789 F.Supp. 1305, 1310 n. 9 (D.N.J.1992).

In addition, this court finds further support to proceed with decision on the pending motion in this matter from Fed.R.Civ.P. 16.[4] It is axiomatic to note that this court has a vital interest in ensuring that the cases before it are run in a manageable and productive manner consistent with constitutional and statutory fundamentals. As a result, this court is vested with broad authority to issue scheduling orders pursuant to Rule 16, and it considers its pretrial case management responsibilities to be among the most important. The Third Circuit Court of Appeals has explained that:

> Rule 16 governs the scheduling and management of pretrial conferences. The purpose of the Rule is to provide for judi-

3. Fed.R.Civ.P. 56(f) provides that:
   Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

4. Fed.R.Civ.P. 16(a) provides that:
   In any action, the court may in its discretion direct the attorneys for the parties and any unrepresented parties to appear before it for a conference or conferences before trial for such purposes as ... (2) establishing early and continuing control so that the case will not be protracted because of lack of management ...

cial control over a case at an early stage in the proceedings. The preparation and presentation of cases is thus streamlined, making the trial process more efficient, less costly, as well as improving and facilitating the opportunities for settlement....

... The purpose of Rule 16 is to maximize the efficiency of the court system by insisting that attorneys and clients cooperate with the court and abandon practices which unreasonably interfere with the expeditious management of cases. The Rule was promulgated as a response "to a widespread feeling that [it] is necessary to encourage pretrial management that meets the needs of modern litigation."

The intent and spirit of Rule 16 is to allow courts to actively manage the timetable of case preparation so as to expedite the speedy disposition of cases....

*Newton v. A.C. & S., Inc.*, 918 F.2d 1121, 1126 (3d Cir.1990) (quoting Fed.R.Civ.P. 16 Advisory Committee Notes). Rule 16 scheduling orders "are at the heart of case management," and if they can be disregarded by non-compliance, "their utility will be severely impaired." *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir.1986). If a party or party's attorney fails to obey a Rule 16 Order, is substantially unprepared to participate in a scheduling conference, or fails to participate in good faith, the court, in addition to imposing sanctions, "may make such orders with regard thereto as are just." Fed.R.Civ.P. 16(f).

Judge Rosen, pursuant to an Order dated May 30, 1995 and Rule 16(f), directed Defendants to file a Rule 56 summary judgment motion. Judge Rosen did so in response to the dilatory and haphazard manner in which Plaintiff's counsel approached discovery and her obligations under Rule 16. A review of the circumstances surrounding Judge Rosen's Order strongly supports his rationale.

Plaintiff filed his complaint with the Clerk of the Court on August 29, 1994. Service of process was effected on December 27, 1994, exactly 120 days after the filing of the complaint. On January 19, 1995, Judge Rosen entered an initial scheduling Order calling for the appearance of counsel on February 22, 1995. (Order for Scheduling Conference, dated January 19, 1995). In that Order, Plaintiff's counsel was also advised of her disclosure obligations under the early discovery provisions of Fed.R.Civ.P. 26. (*Id.*). At Plaintiff's request, the February 22 conference was postponed until May 16, 1995. (Letter from Judge Rosen to counsel, dated April 28, 1995).

On May 16, 1995, Defendants' counsel appeared at Judge Rosen's chambers for the rescheduled conference, only to be informed that Plaintiff's counsel had canceled the conference the day before "due to a conflict in her schedule." (Def.Br. at 14). Defendant's counsel was not informed in advance of this cancellation and appeared in chambers on the appointed date.

By letter dated May 16, 1995, Judge Rosen then rescheduled the now oft-postponed conference for May 23, 1995. When Defendants' counsel appeared once again, he was informed that Plaintiff's counsel "had just called and advised she could not attend and requested a postponement." (*Id.*). Judge Rosen refused to postpone the conference again, but did, however, permit Plaintiff's counsel to send a substitute attorney. When substitute counsel arrived a short while later, Judge Rosen concluded that "through no fault of his own, [he] was not prepared to meaningfully participate in the conference." (Letter Opinion and Order by Judge Rosen, dated September 18, 1995, at 3). Finding this to be violative of his January 19, 1995 Order directing the appearance of counsel "who shall have full authority to bind their clients in all pre-trial matter ... [and, who] shall be prepared to discuss settlement," Judge Rosen imposed sanctions upon Plaintiff. (*Id.* at 2–3). Plaintiff's motion for reargument pursuant to Rule 12I was subsequently denied. (*Id.* at 6–7). At that time and as a result of the unreasonableness of Plaintiff's conduct, Judge Rosen also ordered Defendants to file a motion for summary judgement, which they have now done. (Order by Judge Rosen, dated May 30, 1995).

Furthermore, on June 6, 1995, following Judge Rosen's unsuccessful attempt to convene the scheduling conference and the resultant imposition of sanctions, Plaintiff's counsel and Defendants' counsel met to dis-

cuss the case. At that meeting, Defendants' counsel provided Plaintiff's counsel with "all documents ... regarding the case." (Def.Br. at 15). Plaintiff's counsel did not provide any discovery materials at that meeting as required by Rule 26.

Thus, this court concludes that based upon the Plaintiff's failure to comply with the requirements of Rule 56(f), Plaintiff's counsel's unreasonable and dilatory conduct in this matter, the determination by Judge Rosen, pursuant to Rule 16, that Defendants should file their motion, and Plaintiff's failure to provide any discovery materials, that this matter is ripe for decision on summary judgment.

### B. Summary Judgment Standard

■ The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Hersh v. Allen Products Co., 789 F.2d 230, 232 (3d Cir.1986); Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. See Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983), cert. dismissed, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only be a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing Anderson, 477 U.S. at 249–50, 106 S.Ct. at 2510–11, and Celotex Corp., 477 U.S. at 322, 106 S.Ct. at 2552). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. Anderson, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### C. The Merits of Defendants' Summary Judgment Motion

#### 1. Federal Claims

##### a. Federal Employment Discrimination [5]

Plaintiff brings this suit alleging that Defendants' failure to hire [6] him for a full time position with the Salem City Police Department occurred solely on the basis of his race

---

**5.** Plaintiff appropriately brought his complaint before the EEOC prior to filing his suit with this court. Thus, he has properly exhausted his administrative remedies pursuant to 42 U.S.C. § 2000e–5(c), and his claims can be considered properly before this court.

**6.** This suit is categorized as one for failure to hire because Plaintiff was never actually hired by the S.C.P.D. While he was allowed to come into the police station for "in-house" training, Mayor Johnson did not sign the official civil service forms authorizing his addition to the force because he was awaiting the results of the Federal Bureau of Investigation background check. Furthermore, in Plaintiff's "Mayoral Appointment to Police Force," dated October 1, 1992, it is ex-

pressly noted that his appointment is "subject to the provisions of the New Jersey Department of Personnel's statutes, rules and regulations." Plaintiff's alleged failure to satisfy those provisions are at issue in the instant case. In Plaintiff's complaint, he specifically notes that "he would be employed as a police officer pending a routine security clearance." (Complaint § 51). Mayor Johnson also stated that: "At the time I made the public announcement of Jimmy Watson's appointment to the Department, I also specifically conditioned that appointment upon the successful completion of his background examination and psychological testing." (Johnson Aff. ¶ 14).

and a racist conspiracy. Counts one and two set forth allegations under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2, and the 14th Amendment Equal Protection clause, 42 U.S.C. § 1981a, whereby Plaintiff contends that he not offered a position on the basis of his race. Defendants posit that they are entitled to summary judgment on these counts of the complaint because Plaintiff is unable to satisfy the second prong of the prima facie test enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and applied to Title VII racial discrimination cases.[7]

Under the framework of Title VII, 42 U.S.C. § 2000e–2(a)(1) provides that:

It shall be an unlawful employment practice for an employer—to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

The order and allocation of burdens of proof in failure to hire cases varies and turns upon whether the case can be characterized as a "pretext" case or a "mixed motives" case. *See Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221, 1224–25 (3d Cir.1994), *cert. granted and judgment vacated for reconsideration on other grounds*, —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 286 (1995); *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468–69 (3d Cir.),

*cert. denied*, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993); *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 522 (3d Cir.1992), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). If the case can be considered one of pretext, the analysis proffered by the Supreme Court in *McDonnell Douglas*, and subsequently elaborated on in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981), is to be applied. If the suit is one involving mixed motives, then the analysis developed in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246–48, 109 S.Ct. 1775, 1788–89, 104 L.Ed.2d 268 (1989) is to be used.

■ The instant case clearly falls under the pretext analysis and the *McDonnell Douglas/Burdine* line of cases, and both Plaintiff and Defendant confine their arguments accordingly.[8] In a pretext situation, the "employee argues that the employer's facially legitimate reason for the employment decision was false and thus was not the real reason for the decision." *Griffiths*, 988 F.2d at 469–69. *See also Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1789 ("[T]he premise of [a pretext case] is that either a legitimate or an illegitimate set of considerations led to the challenged decision."). A pretextual situation is unlike that found in a mixed motive case, where "both legitimate and illegitimate factors contribute to the employment decision." *Mardell*, 31 F.3d at 1225 n. 6. *See also Griffiths*, 988 F.2d at 469 ("a mixture of

---

7. Although Plaintiff alleged violations of both Title VII and § 1981, the elements of both claims are identical. *See Roebuck v. Drexel University*, 852 F.2d 715, 726 (3d Cir.1988); *Lewis v. University of Pittsburgh*, 725 F.2d 910, 915 n. 5 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984) ("§ 1981 and § 1983 ... claims require the same elements of proof as a Title VII action"). *See also Anderson v. Douglas & Lomason, Co., Inc.*, 26 F.3d 1277, 1284 n. 7 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995).

8. However, "[t]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Hill v. Bethlehem Steel Corp.*, 729 F.Supp. 1071, 1073 n. 3 (E.D.Pa. 1989), *aff'd*, 902 F.2d 1560 (3rd Cir.1990) (quoting *Trans World Airlines v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985)). *See also Weldon v. Kraft, Inc.*, 896 F.2d

793, 796 (3d Cir.1990) (recognizing that "[a]bsent direct evidence, [a] plaintiff may prove intent through the framework established in *McDonnell Douglas v. Green* ... and refined in *Texas Department of Community Affairs v. Burdine*"); *Lindsey v. American Cast Iron Pipe Co.*, 772 F.2d 799, 801–02 (11th Cir.1985) (holding that "in cases in which there is direct evidence that discrimination was a significant factor in an employment decision, the allocation of proof prescribed in *McDonnell Douglas* does not apply"). Since Plaintiff herein presents no direct, "smoking gun" evidence of discrimination, this court need look no further than the *McDonnell Douglas–Burdine* framework. In fact, as is noted in the text, both parties' submissions in connection with this motion rely exclusively upon the *McDonnell Douglas–Burdine* analysis for proving discrimination.

legitimate reasons and prohibited discriminatory motives").

■ In a pretext case under the *McDonnell Douglas/Burdine* regime, Plaintiff is charged with the burden of establishing a prima facie case by preponderance of the evidence. *See Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093; *Ezold,* 983 F.2d at 522. Once Plaintiff succeeds in making this showing, the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. *See also Mardell,* 31 F.3d at 1225 n. 9. If Defendant's evidence creates a genuine issue of fact, the presumption of discrimination falls out and Plaintiff must demonstrate by preponderance of the evidence that the employer's explanation was merely a pretext. *See Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095–96; *Ezold,* 983 F.2d at 522; *Bennun v. Rutgers State University,* 941 F.2d 154, 170 (3d Cir.1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). The ultimate burden of persuasion remains with the Plaintiff, who must prove by a preponderance of the evidence that the reasons asserted by the Defendants were a pretext for discrimination such that · the proffered reason is merely a fabricated justification for the discriminatory conduct. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

To satisfy the *McDonnell Douglas/Burdine* prima facie case, Plaintiff must demonstrate, or for purposes of this summary judgment motion, raise a material issue of fact with regard to the following issues:

(i) that he belongs to a [protected category];

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. *See also Mardell,* 31 F.3d at 1225 n. 9. While Plaintiff's initial burden in establishing a prima facie case is not an onerous one, it is directly at issue in the instant case. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Weldon,* 896 F.2d at 797.

Defendants, as noted above, contend that Plaintiff cannot satisfy the second element of the *McDonnell Douglas/Burdine* test, and, as such, summary judgment should be granted as to counts one and two. *See Fowle v. C & C Cola, a Division of ITT–Continental Baking Co.,* 868 F.2d 59, 64–65 (3d Cir.1989) (discussing the second element of the *McDonnell Douglas/Burdine* test); *Gorham v. American Tel. & Tel. Co.,* 762 F.Supp. 1138, 1143–45 (D.N.J.1991) (same); *Oare v. Midlantic Nat'l Bank/Merchants,* No. 88–4141, 1990 WL 4622 at *4 (D.N.J.1990) (same). The second element of the prima facie case requires that Plaintiff demonstrate that he was "qualified" for the position of police officer, or for purposes of this summary judgment motion, Plaintiff must raise a genuine issue of fact as to his qualifications for the position of police officer with the S.C.P.D. In analyzing the second element of the prima facie case, this court must confine its inquiry to the objective qualifications related to the position of police officer. *See Fowle,* 868 F.2d at 64–65 (noting that subjective criteria are more "properly cognizable at the later stages of the *McDonnell Douglas/Burdine* analysis"); *Ezold,* 983 F.2d at 523.

■ Defendants posit that not only was Plaintiff "not qualified for the position," but, he was actually "legally disqualified from having the position under several state laws." (Def.Br. at 21). First, Defendants contend that pursuant to *N.J.S.A.* 40A:14–9,[9] Plaintiff is prohibited from holding the job of police officer. *N.J.S.A.* 40A:14–122 outlines the qualifications needed to serve as a police

---

**9.** In their brief, Defendants direct the court to *N.J.S.A.* 40A:14–9, which pertains to the qualifications needed for appointment to a local fire department or fire force. However, as *N.J.S.A.* 40A:14–9 is the statutory analog to *N.J.S.A.* 40A:14–122 and contains substantially similar language, this court will consider Defendants' arguments as premised upon *N.J.S.A.* 40A:14–122.

officer in New Jersey and provides, in relevant part, that: "Except as otherwise provided by law, no person shall be appointed as a member of the police department and force, unless he . . . (4) is of good moral character, and has not been convicted of any criminal offense involving moral turpitude." The Supreme Court of New Jersey and the lower courts have yet to offer an interpretation of what crimes involve "moral turpitude" for purposes of the police officer disabling provision. However, under a similar New Jersey state disabling provision for those holding office or position in municipal government, *N.J.S.A.* 40:69A–166,[10] larceny was found to be a crime involving moral turpitude. *See Raphalides v. New Jersey Dep't. of Civil Service,* 80 N.J.Super. 407, 409–10, 194 A.2d 1 (App.Div.1963), *certif. denied,* 41 N.J. 597, 198 A.2d 444 (1964) (holding that for purposes of a New Jersey statute making those convicted of a crime involving moral turpitude ineligible to hold office or position in a municipality, that "[l]arceny was a felony at common law and, whether grand or petit, is uniformly held to involve moral turpitude").

Furthermore, it clear that the crime for which Plaintiff has been convicted is sufficient to bar him from employment as a police officer in New Jersey. The Federal Bureau of Investigation background check of Plaintiff reveals that in June of 1990, he was charged with both Grand Larceny and Burglary in the Second Degree in Aiken, South Carolina and convicted of Grand Larceny. (Def.App. § 3). As a result of this conviction, he received a three year sentence, which was suspended, and three years probation. In addition, he was ordered to pay restitution in the amount of $1677.00. (*Id.*). The Aiken Department of Public Safety incident report reveals that he broke a window pane to gain entry to the victim's house and stole clothing from the victim's bedroom.[11] (*Id.*). When interviewed about the matter by the investigating officer, Plaintiff also stated that he entered a repair garage and vandalized his ex-wife's vehicle. (*Id.*). Thus, based on the conclusion of the New Jersey Superior Court Appellate Division in *Raphalides* and an independent analysis of the conduct underlying Plaintiff's conviction for Grand Larceny, and without engaging in the subjective question of Plaintiff's "good moral character," it is obvious that Plaintiff's conviction for Grand Larceny and concomitant suspended sentence, probation, and restitution is a "criminal offense involving moral turpitude," sufficient to bar him from employment as a member of the Salem City Police Department.[12]

---

**10.** *N.J.S.A.* 40:69A–166 provides, in relevant part, that: "Any person convicted of a crime or offense involving moral turpitude shall be ineligible to assume any municipal office, position or employment in a municipality governed pursuant to this act, and upon conviction thereof while in office shall forfeit his office[.]"

**11.** The victim in this incident was Plaintiff's ex-wife. As such, Plaintiff has characterized this episode as a "domestic disturbance."

**12.** In addition, Defendants assert that *N.J.S.A.* 2C:39–7 also operates to bar Plaintiff from employment with the police department as a police officer. *N.J.S.A.* 2C:39–7(a) and (b) criminalize the purchase, ownership, or possession of a weapon by those convicted in New Jersey or elsewhere of aggravated assault, arson, burglary, escape, extortion, homicide, kidnapping, robbery, aggravated sexual assault, sexual assault, endangering the welfare of a child, a firearms offense, or unlawful use, possession or sale of a controlled dangerous substance. Furthermore, subsection (c) of the statute provides that "[w]henever any person shall have been convicted in another state . . . in a court of competent jurisdiction of a crime which in said other jurisdiction . . . is comparable to one of the crimes enumerated . . . then that person shall be subject to the provisions of this section." *N.J.S.A.* 2C:39–7(c). Because Plaintiff has been convicted of Grand Larceny, and Grand Larceny is not one of the crimes enumerated in *N.J.S.A.* 2C:39–7, this court is required to examine the South Carolina Grand Larceny statute to see if it is "comparable" to one of those crimes enumerated by New Jersey. This court concludes that it is not.

The State of South Carolina, pursuant to *S.C.Code Ann.* § 16–13–30 defines Grand Larceny as: "Larceny of goods, chattels, instruments, or other personalty valued in excess of one thousand dollars. . . . Upon conviction, the person is guilty of a felony and must be fined in the discretion of the court or imprisoned . . ." New Jersey maintains a similar statute entitled "Theft by Unlawful Taking or Disposition," codified at *N.J.S.A.* 2C:20–3, which provides that: "A person is guilty of theft if he unlawfully takes, or exercises control over, movable property of another with purpose to deprive him thereof." *See People v. Armstrong,* 167 A.D.2d 108, 109, 561 N.Y.S.2d 433, 434 (App.Div. 1st Dept.1990), *ap-*

Plaintiff has failed to raise a material issue of fact with regard to this element. In response to Defendants' arguments, Plaintiff asserts in his appendix that he was qualified for the job because he passed the civil service examination. (Pl.App. § A). Defendants admit that he was qualified to hold the position based upon his civil service score, but that fact, taken alone, does not satisfy all of the requirements to serve as a police officer in the state of New Jersey and does not overcome the statutory bar to employment as a police officer that is created by his conviction and probationary status under *N.J.S.A.* 40A:14–122.

Plaintiff also purports to raise a material issue of fact with regard to this element by asserting that "defendants purposely lied, conspired and decieve [sic] plaintiff into applying for said position, knowing fully plaintiffs prior legal problems and misleading him that he had the position." (*Id.* at 10). In support of this he Certifies that on his application of employment he "listed the crime of breaking and entering and larceny in Aiken, South Carolina because that it is what I recalled the Court informing me that it was a misdemeanor." (Watson Aff. ¶ 8). However, the fact that Plaintiff was mistaken as to the gravity of his conviction in that it was a felony, as opposed to a misdemeanor, and informed Mayor Johnson and Chief May that it merely was a misdemeanor, does not create a material issue of fact with regard to the second element. Both Chief May and Mayor Johnson Certify that they were told that Plaintiff's troubles were domestic and minor in nature. (Johnson Aff. ¶ 12) (noting that Plaintiff "acknowledged that he had domestic disputes that resulted from estrangement with his spouse, but at no time did he indicate that there was anything of a criminal nature other than those judicial procedures which arise out of a temporary restraining order. He certainly never indicated that he was still on probation as a result of serious criminal convictions."); (May Aff. ¶ 6) ("Prior

to the Mayor's final decision on the appointment of Watson to the force, I discussed the incident Watson had disclosed on his employment application as a misdemeanor in the State of South Carolina.").

Thus, because there is no material issue of fact in dispute with regard to the second element of the *McDonnell Douglas/Burdine* test, this court concludes that Plaintiff was not qualified to hold the position of police officer in the Salem City Police Department as a result of *N.J.S.A.* 40A:14–122 and his conviction for Grand Larceny in South Carolina. Accordingly, summary judgment is hereby granted in favor of Defendants as to counts one and two of Plaintiff's Complaint.

### b. *42 U.S.C. § 1983*

In count twelve of his complaint, Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that Defendants "had a policy to discriminate against blacks by not offering them employment and by termination of blacks without cause." (Complaint §§ 65–67). Discriminatory employment practices are actionable under § 1983. *See District Council 47 (AFSCME) v. Bradley*, 795 F.2d 310, 313–15 (3d Cir.1986); *Clark v. Caln Township*, No. 90–1551, 1991 WL 86911, at *4 (E.D.Pa. May 20, 1991). However, Plaintiff puts forth no evidence to support the contention that the S.C.P.D. had either a policy to discriminate against blacks through a failure to hire or a policy to terminate blacks without cause. The facts of the instant case specifically belie these arguments.

With regard to the claim that Defendants refused to hire black police officers, Plaintiff, as is noted above, was clearly not the most qualified candidate for the new opening on the S.C.P.D. Plaintiff was third on the NJDOP uncertified roster, trailing two caucasian males with superior test scores. (Def.App. § 1). Mayor Johnson, in his desire to hire a black police officer, conditional-

*peal denied,* 77 N.Y.2d 903, 569 N.Y.S.2d 935, 572 N.E.2d 618 (N.Y.1991) (holding that the New Jersey "crime of theft ... was analogous to the New York felony of grand larceny in the third degree"). Thus, as theft by unlawful taking is not enumerated as a disabling felony in *N.J.S.A.* 2C:39–7, and this felony is most similar to the

South Carolina felony of Grand Larceny of which Plaintiff has been convicted, Plaintiff would not be barred from carrying a firearm while a police officer in the state of New Jersey and consequently, could not be barred from assuming a role on the S.C.P.D. because he is unable to carry a firearm.

ly offered Plaintiff the job despite the fact that his test scores were inferior to that of the two candidates ahead of him on the roster. (Johnson Aff. ¶¶ 6, 10). Plaintiff has adduced no evidence to raise a material issue of fact that the S.C.P.D. had or has a racially discriminatory hiring policy.

Furthermore, Plaintiff has proffered no evidence to demonstrate that the S.C.P.D. has a policy to fire black police officers without cause. As is addressed *supra*, Defendants refused to grant Plaintiff a permanent position on the S.C.P.D. only after it was revealed that he had misrepresented the scope of his prior criminal record. Aside from what Plaintiff considers a firing without cause in his own case, Plaintiff does not cite or produce any other instances of purported discriminatory firing by the Defendants. As such, summary judgment is hereby granted to Defendants with regard to count twelve of Plaintiff's complaint.

#### c. Other Federal Constitutional Claims

Plaintiff, in addition to the counts of his complaint premised upon 42 U.S.C. § 2000e–2, and 42 U.S.C. §§ 1981 and 1983, puts forth several other federal causes of action grounded in the Fourteenth Amendment. They will be addressed in turn.

■ In count five of his complaint, Plaintiff alleges that his Fourteenth Amendment rights of Equal Protection and Due Process were violated as a result of what he perceived to be a more extensive background investigation than other similarly situated officers. (Complaint §§ 42–43). The record before this court indicates that Defendants have submitted the background checks of all S.C.P.D. officers hired in the last ten years. (Def.App. § 9). The reports illustrate that not a single officer had an entry in his or her criminal history category. (*Id.*). Furthermore, in 1990, Salem City and the S.C.P.D. removed a caucasian applicant from consideration for the job of patrolman after it was revealed that this applicant was charged with aggravated assault and entered a pre-trial intervention program. (*Id.* at § 10). Thus, even though that applicant did not have the conviction and resultant probation on his record that Plaintiff does, the Defendants struck

his name from consideration for the patrolman position. Plaintiff does not submit any evidence to demonstrate that he was subject to a more rigorous background investigation than those officers who were either subsequently hired or were not hired by the S.C.P.D. As such, no material issues of fact are raised with regard to this claim, and the court will grant summary judgment to Defendants as to count five of Plaintiff's complaint.

■ In count eleven of his complaint, Plaintiff asserts that he was denied "notice and a pre or post deprivation hearing by an impartial body" in violation of the Equal Protection Clause of the Fourteenth Amendment. (Complaint §§ 61–62). This is not an accurate reflection of the events that occurred subsequent to the revelation of the true extent of Plaintiff's criminal history. On or about October 15, 1992, Mayor Johnson notified Plaintiff that he intended to seek his expulsion from the New Jersey Civil Service open competitive employment list. After reviewing the available documentation, the New Jersey Department of Personnel ("NJDOP") removed Plaintiff's name from the open competitive employment list. Plaintiff appealed this determination to the NJDOP and, finding that Plaintiff failed to present any further arguments or proofs, the NJDOP rejected the appeal. Plaintiff declined to pursue an appeal to the Merit System Board. (Def.App. § 8). In a similar manner to count five, Plaintiff has not raised presented any evidence so as to raise a material issue of fact with regard to the allegation that he was denied a hearing when his name was removed from the NJDOP open competitive employment list. Consequently, summary judgment is hereby granted to Defendants as to count eleven of Plaintiff's complaint.

■ Lastly, in count eight of his complaint, Plaintiff alleges that Defendants did not "properly review the domestic dispute in [his] history in that [he] remains qualified to be a police officer" in violation of his Fourteenth Amendment Equal Protection rights. (Complaint §§ 54–55). Plaintiff presents no possible scenario as to how the Salem City

authorities could have handled the matter differently. In fact, this count of Plaintiff's complaint appears to be based upon his misperceptions as to the disabling effect of his conviction for Grand Larceny in South Carolina.

Upon learning of Plaintiff's conviction for Grand Larceny in South Carolina and sentence of probation for the offense from the FBI background investigation report, Mayor Johnson and Chief May confirmed this fact with Plaintiff's probation officer in South Carolina. (Johnson Aff. ¶ 16). As a result, they concluded that Plaintiff would be ineligible to serve as a police officer in New Jersey pursuant to *N.J.S.A.* 40A:14–122(4) and advised Plaintiff as such via letter dated October 15, 1992. (*Id.* at ¶ 21; Def.App. § 6).

Thus, it is clear that Plaintiff has not presented any evidence as to how Defendants improperly reviewed the so-called "domestic dispute" that was revealed in his FBI background check and consequently caused Mayor Johnson and the S.C.P.D. to reconsider his pending appointment. Accordingly, summary judgment is hereby granted to Defendants with regard to count eight of Plaintiff's complaint.

### 2. State Law Claims [13]

#### a. Intentional and Negligent Infliction of Emotional Distress

■ Counts three and four of Plaintiff's complaint allege state law claims of intentional infliction of emotional distress and negligent infliction of emotional distress. Count three, alleging intentional infliction of emotional distress, asserts that Defendant's actions were "extreme and outrageous" because "Defendants knew that Plaintiff had a domestic action on his record prior to their inducement to his employment [sic]." (Complaint §§ 34–35). Count four, alleging negligent infliction of emotional distress, asserts that Defendants' breached their duty of care

to Plaintiff and "knew or should have known their wrongful actions could cause severe emotional distress to Plaintiff." (*Id.* at §§ 38–39).

■ Defendants correctly counter that Plaintiff's allegations with regard to Counts 3 and 4 are properly governed according to the limitations imposed by the New Jersey Tort Claims Act ("NJTCA"), *N.J.S.A.* 59:1–1 *et seq.*, as all Defendants, Salem City, the Salem City Police Department, Mayor Johnson, and Chief May, are either public entities or public employees. *See N.J.S.A.* 59:1–3.[14] Consequently, *N.J.S.A.* 59:9–2(d) delineates the circumstances under which damages may be recovered for pain and suffering, providing that:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical expenses are in excess of $1,000.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service.

■ The New Jersey Supreme Court has concluded, for purposes of *N.J.S.A.* 59:9–2(d), that emotional distress falls within the definition of "pain and suffering." *See Ayers v. Jackson Township,* 106 N.J. 557, 566–67, 525 A.2d 287 (1987) ("it is evident that subjective symptoms such as depression, fear, and anxiety—either as a consequence of emotional distress or a broken limb—constitute 'pain and suffering' for the purposes of the Tort Claims Act"). *See also PBA Local No.*

---

13. Plaintiff's pendant state law claims are properly before this court pursuant to 28 U.S.C. § 1367.

14. Pursuant to *N.J.S.A.* 59:1–3, a public employee is defined as "an employee of a public entity" and a public entity is defined as "the State, and any county, municipality, district, public authori-

ty, public agency, and any other political subdivision or public body of the State." Thus, as Mayor Johnson and Chief May are employees of Salem City, a municipality and public entity, they are appropriately classified as "public employees."

*38 v. Woodbridge Police Dep't.,* 832 F.Supp. 808, 820 (D.N.J.1993) ("New Jersey courts have characterized the subjective symptoms accompanying emotional distress as within the definition of pain and suffering."). Thus, in order to recover for pain and suffering under the damages provision of *N.J.S.A.* 59:9–2(d), Plaintiff must demonstrate both a permanent loss of bodily function, permanent disfigurement or dismemberment and medical expenses in excess of $1000.00. *See Marion v. Borough of Manasquan,* 231 N.J.Super. 320, 332, 555 A.2d 699 (App.Div.1989) ("Pain and suffering, except in the aggravated circumstances described in [*N.J.S.A.* 59:9–2(d) ], are not compensable under the Act."). Plaintiff has adduced no evidence that he has suffered the requisite statutory injuries and it does not appear that he has in fact suffered a compensable injury under the statute. Moreover, nowhere does plaintiff's response to this motion even attempt to make a colorable showing that Defendants owed some duty of due care in refusing to hire Plaintiff once they became aware Plaintiff had failed to disclose his prior felony. New Jersey tort law does not provide recovery for those who suffer emotional distress when their own criminal record bars employment. Accordingly, summary judgment is hereby granted to Defendants with regard to counts three and four of Plaintiff's complaint.

### b. Invasion of Privacy

■ With regard to count thirteen, Plaintiff has alleged that Defendants breached his right to privacy by "releas[ing] privileged and confidential employment matters to the public" resulting in "severe emotional distress; reduced income and lost opportunities." (Complaint §§ 69–71). Plaintiff's claims for severe emotional distress arising from the purported invasion of privacy must be analyzed and dismissed on summary judgment in the same fashion as the aforementioned negligent and intentional infliction of emotional distress claims. *See PBA Local 38,* 832 F.Supp. at 820–21 (dismissing invasion of privacy claims on summary judgment insofar as they sought damages for "humiliation, mental pain and anguish"). Because Plaintiff is seeking damages for "pain and suffering" under *N.J.S.A.* 59:9–2(d) he must put forth evidence of severe injury and the requisite statutory medical expenses. *See Ayers,* 106 N.J. at 576–77, 525 A.2d 287; *Marion,* 231 N.J.Super. at 332, 555 A.2d 699. Plaintiff, as noted above, has failed to do so and therefore, summary judgment is hereby granted to Defendants with regard to that portion of count thirteen which seeks damages for severe emotional distress.

■ In alleging that the Defendants have invaded his privacy, Plaintiff also seeks damages for "reduced income and lost opportunities." (Complaint § 71). Defendants counter by positing that it was not they who invaded Plaintiff's privacy, but it was Plaintiff who actually released private information about himself to the public. (Def.Br. at 23; Def.App. § 7). Again, Plaintiff's allegations and version of the events are not supported by the evidence; in fact, the contrary appears to be true. By letter dated on or about October 30, 1992, Plaintiff wrote to the Salem City newspaper, *Today's Sunbeam,* and revealed what he perceived the facts to be that underpin this case. In the October 30, 1992 letter, Plaintiff discussed the nature of his claims pending before the U.S. Department of Labor, New Jersey Civil Rights Bureau, and New Jersey Civil Service Commission, and revealed the "domestic incident" which occurred in South Carolina. (Def.App. § 7 (Letter from James Watson to *Today's Sunbeam* )). Plaintiff has offered no evidence as to how defendants' invaded his privacy. Moreover, a record of criminal conviction is public information, as is the fact that Plaintiff was under probation supervision at the time of his application for employment. Thus, as Plaintiff has put forth no evidence that Defendants released confidential information about his employment history to the public, and it in fact appears that Plaintiff himself released confidential information to the public, Plaintiff has failed to create an issue of material fact to defeat summary judgment as to the remainder of count thirteen.

### c. New Jersey Public Policy

■ Count nine of Plaintiff's complaint alleges that his "termination was viola-

tive of state public policy." (Complaint § 57). The New Jersey Supreme Court has determined that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505 (1980). *See also Versarge v. Township of Clinton New Jersey*, 984 F.2d 1359, 1371 (3d Cir. 1993). New Jersey public policy, however, as evidenced by *N.J.S.A.* 40A:14–122, *see supra* part C.1.a, clearly requires that local police officers be of "good moral character." In the instant situation, as noted above, Plaintiff was legally ineligible to serve as police officer in the state of New Jersey on the basis of his conviction for Grand Larceny in the state of South Carolina. It is unprecedented to suggest that New Jersey has a public policy of hiring convicted grand larcenists as police officers. Plaintiff has adduced no evidence demonstrating how Defendants violated New Jersey public policy under the *Pierce* doctrine sufficient to raise an issue of material fact with regard to this claim, and therefore summary judgment will be granted to defendants as to count nine.

### d. Contract Claims

■ Counts seven and ten of Plaintiff's complaint allege breach of both an express and an implied contract between Plaintiff and the S.C.P.D. Count seven alleges that an express contract between Plaintiff and the S.C.P.D. was created and that the agreement was "supported by consideration whereby Plaintiff would be employed as a police officer pending a routine security clearance." (Complaint § 51). Count ten alleges merely that the actions of the S.C.P.D. are in breach of an implied contract. (Complaint § 59). Defendants counter that, assuming *arguendo* a binding contract or enforceable promise was created, "the allegations of Plaintiff's own complaint demonstrate that the alleged contract or promise was subject to completion of the background investigation." (Def.Br. at 27).

■ Under New Jersey law, parties to a contract "are at liberty to agree on one or more conditions precedent upon which their liability will depend." *State Farm Mu-*

*tual Automobile Ins. Co. v. Anderson*, 70 N.J.Super. 520, 527, 176 A.2d 23 (App.Div. 1961) (citing *Kennedy v. Westinghouse Electric Corp.*, 29 N.J.Super. 68, 78, 101 A.2d 592 (App.Div.1953), *aff'd*, 16 N.J. 280, 108 A.2d 409 (1954)). A condition precedent has been defined as a "fact or event occurring subsequently to the making of a valid contract and which must exist or occur before there is a right to immediate performance, before there is a breach of contract duty or before the usual judicial remedies are available." *Moorestown Management v. Moorestown Bookshop, Inc.*, 104 N.J.Super. 250, 262, 249 A.2d 623 (Ch.Div.1969) (citing 3A A. Corbin, Corbin on Contracts § 628 (1963)). *See also Suburban Transfer Service, Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 225 (3d Cir. 1983) (adopting the *Moorestown Management*, 104 N.J.Super. at 262, 249 A.2d 623, definition of a condition precedent).

In the instant case, there is no doubt that if a contract did exist at all, either express or implied, it was subject to the condition precedent of a satisfactory background check. Plaintiff, in § 51 of his complaint, and noted above, specifically admits as much. Defendant Mayor Johnson, the Salem City authority in charge of police department hiring had an identical recollection of the circumstances surrounding Plaintiff's hiring and stated that: "At the time I made the public announcement of Jimmy Watson's appointment to the Department, I also specifically conditioned that appointment upon the successful completion of his background examination and psychological testing." (Aff. of Johnson § 14).

Thus, Plaintiff's successful completion of the background investigation was clearly a valid condition precedent to the creation of an enforceable contract. *See Moorestown Management*, 104 N.J.Super. at 262, 249 A.2d 623. As there is no dispute as to the fact that Plaintiff failed to successfully complete the background investigation, and therefore satisfy the condition precedent, "the usual judicial remedies," *Moorestown Management*, 104 N.J.Super. at 262, 249 A.2d 623, are not available to Plaintiff for breach of contract, either express or implied, and summary judgment is hereby granted to Defendants as to counts seven and ten.

In a manner similar to counts seven and ten, count six alleges that Plaintiff is entitled to recover under a theory of promissory estoppel, as Defendants purportedly induced Plaintiff into employment with the knowledge that he "had a domestic disturbance in his history." (Complaint §§ 47–49). Defendants counter that, as they did to Plaintiff's claims from breach of an express and implied contract, that any promise was "subject to and/or contingent upon the satisfactory outcome of the background investigation." (Def.Br. at 27).

The doctrine of promissory estoppel is well-established in New Jersey. *See The Malaker Corp. Stockholders Protective Committee v. First Jersey National Bank*, 163 N.J.Super. 463, 479, 395 A.2d 222 (App.Div. 1978), *certif. denied*, 79 N.J. 488, 401 A.2d 243 (1979) ("Suffice it to say that given an appropriate case, the doctrine [of promissory estoppel] will be enforced."). Promissory estoppel may apply where "a promisor makes a promise with the reasonable expectation that it will induce either action or forbearance by the promisee and where enforcement of the promise is necessary to avoid injustice." *McDonald's Corp. v. Miller*, No. 92–4811, 1994 WL 507822 at *10 (D.N.J. Sept. 14, 1994). However, in order to satisfy the prima facie case sufficient to invoke the doctrine, Plaintiff bears the burden to demonstrate the existence of, or for purposes of summary judgment, a dispute as to a material fact, with regard to four separate elements. The elements include:

(1) a clear and definite promise by the promisor;

(2) the promise must be made with the expectation that the promisee will rely thereon;

(3) the promisee must in fact reasonably rely on the promise; and

(4) detriment of a definite and substantial nature must be incurred in reliance on the promise.

*Id. See also Ballard v. Schoenberg*, 224 N.J.Super. 661, 666, 541 A.2d 258 (App.Div.),

*certif. denied*, 113 N.J. 367, 550 A.2d 473 (1988); *Great Falls Bank v. Pardo*, 263 N.J.Super. 388, 402 n. 9, 622 A.2d 1353 (Ch. Div.1993), *aff'd*, 273 N.J.Super. 542, 642 A.2d 1037 (App.Div.1994); *California Natural, Inc. v. Nestle Holdings, Inc.*, 631 F.Supp. 465, 472 (D.N.J.1986).

The "clear and definite promise" requirement, or the first prong of the test set forth in *The Malaker Corp.*, is considered the "*sine qua non* for applicability of this theory of recovery.*" 163 N.J.Super. at 479, 395 A.2d 222. In the case at bar, and as discussed above, the promise made to Plaintiff was clearly conditional and contingent, as opposed to clear and definite—contingent upon a satisfactory completion of the required background check. As there is no dispute with regard to the first prong of the *Malaker* test and it is clear that Plaintiff cannot demonstrate that a clear and definite promise was made to him, summary judgment is hereby granted to Defendants as to count six.

### D. Motion for Costs and Attorney's Fees Pursuant to Rule 11

The Defendants have also made application to this court, pursuant to Fed. R.Civ.P. 11, for an award of costs and attorney's fees against Plaintiff's counsel, Sylvia Hall. Defendants contend that a sanction of fees and costs is appropriate in this instance because Plaintiff's counsel has not demonstrated "any factual basis for the matters alleged in the Complaint." (Defendant's Cross Motion at 6). Plaintiff's counsel, in response, contends that she "had completed sufficient investigations prior to filing the complaint" and that "it is not necessary ... to have considerable objective proof before prosecuting a discrimination claim." (Plaintiff's Opposition Brief at 2, 4).[15]

Rule 11 imposes obligations on the attorney signing each and every "pleading, written motion, or other paper," that:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other

---

**15.** Defendants' motion for Rule 11 sanctions is properly before this court, as it was forwarded to Plaintiff's counsel more than twenty-one days prior to filing, as required by Rule 11(c)(1)(A). Plaintiff's counsel, upon receipt of this motion, did not elect to withdraw the complaint.

paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and] (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed.R.Civ.P. 11(b)(2) and (3).

The Supreme Court has concluded that "the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990). *See also Napier v. Thirty or More Unidentified Federal Agents,* 855 F.2d 1080, 1090–91 (3d Cir.1988) (quoting *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 157 (3d Cir.1986)) (noting that Rule 11 "is intended to discourage pleadings that are 'frivolous, legally unreasonable, or without factual foundation' "); *Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir.1988) (quoting *Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 483 (3d Cir.1987)) (noting that the primary purpose of Rule 11 is the " 'correction of litigation abuse' ").

▆▆▆ The signature requirement of Rule 11 serves as a certification of three elements, namely, "that the signer (1) has read the document, (2) has concluded, after a reasonable inquiry into both the facts and the law, that to the best of his knowledge, information, and belief there is good ground to support the document, and (3) is acting without an improper motivation." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1335 at 57–58 (2d ed. 1990). *See also Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 542–43, 111 S.Ct. 922, 928–29, 112 L.Ed.2d 1140 (1991); *Garr v. U.S.*

*Healthcare, Inc.,* 22 F.3d 1274, 1278 (3d Cir. 1994). The signer of a pleading, motion or other document has an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing. *See Business Guides, Inc.,* 498 U.S. at 549–550, 111 S.Ct. at 932–33. Defendants contend that Plaintiff's counsel failed to make a reasonable inquiry into both the facts and the law of the instant case, but, primarily, defendants assert there were no grounds to support the factual allegations of the Complaint against Salem City, the Salem City Police Department, Mayor Leon Johnson, and Police Chief Harold May. This court agrees.

▆▆▆ The reasonable inquiry element is measured by an objective standard of reasonableness under the circumstances. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 47, 111 S.Ct. 2123, 2134, 115 L.Ed.2d 27 (1991) ("Rule 11 ... imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith."). Subjective good faith on the part of the attorney is insufficient to avoid sanction. *See Gaiardo,* 835 F.2d at 482 (quoting Schwarzer, *Sanctions Under the New Rule 11—A Closer Look,* 104 F.R.D. 181, 187 (1985)) ("the Rule does not permit use of the 'pure heart and empty head defense' "). This court must examine the objective knowledge of the attorney at the time the challenged paper was signed to determine whether the claim was well grounded in both law and fact. *See Cooter & Gell,* 496 U.S. at 399, 110 S.Ct. at 2457–58; *Teamsters Local Union No. 430 v. Cement Express, Inc.,* 841 F.2d 66, 68 (3d Cir.1988), *cert. denied,* 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1989); *Eavenson, Auchmuty & Greenwald v. Holtzman,* 775 F.2d 535, 540 (3d Cir.1985). As the Third Circuit has stated, an attorney must "Stop, Think, Investigate and Research before filing papers either to initiate a suit or to conduct the litigation." *Gaiardo,* 835 F.2d at 482. *See also Becker v. Sherwin Williams,* 717 F.Supp. 288, 296–97 (D.N.J.1989).

▆▆▆ However, sanctions are warranted "only in the 'exceptional circumstance' where a claim or motion is patently unmeritorious or frivolous." *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277,

289 (3d Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (citing *Doering,* 857 F.2d at 194). Thus, this court must determine whether a competent attorney who conducted a reasonable investigation into the facts and law pertinent to the case would have determined that the allegations presented against defendants were well grounded in law and fact. In the instant case, it is clear that even a small degree of investigation or research would have forced Plaintiff's counsel to reconsider her decision to file the Complaint commencing this action in the manner that she did. In fact, the primary reason that this court's summary judgment Opinion on this matter is so lengthy is because so many of Plaintiff's claims were foreclosed by the operation of law.

Plaintiff's counsel, on numerous occasions in the Complaint, pleadings, and hearings before Judge Rosen, explained that this lawsuit was grounded in the belief that there was a racial conspiracy in Salem City, led by the Mayor and Police Chief, to deny Plaintiff a job with the Salem City Police Department while at the same time appeasing the black community. Yet, at no time did Plaintiff's counsel ever demonstrate that the defendants acted improperly in any manner or that there was any basis in fact for the alleged conspiracy. *See Becker,* 717 F.Supp. at 297 (quoting *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 505 (9th Cir.1986)) (noting that a " 'complaint filed in federal court is not a vehicle for airing rumor, suspicion, or mere hostility' "). The bulk of Plaintiff's claims were foreclosed by operation of law, *N.J.S.A.* 40A:14–122, and the fact that Plaintiff was convicted of Grand Larceny in the state of South Carolina. The Defendants' motion for summary judgment which was granted, *supra,* makes clear "not only that Plaintiff was not entitled to relief, but that the complaint was clearly without factual basis from the start, and that [Plaintiff's counsel] did not consider whether his claims had any merit whatsoever prior to filing [this] lawsuit." *Wei v. Bodner,* No. 89–1137, 1992 WL 165860, at \*4 (D.N.J. April 8, 1992), *aff'd,* 983 F.2d 1054 (3d Cir.1992).

One of the factors to be considered in determining "reasonableness" under the circumstances is whether a Plaintiff or Plaintiff's counsel is in a position to know or acquire the relevant factual details. *Colburn v. Upper Darby Township,* 838 F.2d 663, 667 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). All of the relevant details, however, were in the hands of Plaintiff's counsel or were easily ascertainable with the smallest modicum of investigation. Counts one and two of the complaint, based on Title VII and 42 U.S.C. § 1981, as well as count twelve, grounded in 42 U.S.C. § 1983, alleged that the defendants acted in a racially discriminatorily manner toward Plaintiff. A cursory review of Plaintiff's prior conviction and subsequent sentence of probation, taken in conjunction with *N.J.S.A.* 40A:14–122, would have revealed that Defendants had no choice but to not go forward with their plan to hire Plaintiff. Even assuming that Plaintiff's counsel had no duty to research the applicable law (which she does), the appropriate statutory reference was provided in the letter sent from Mayor Johnson to Plaintiff on October 15, 1992.

Furthermore, Plaintiff's counsel, in count eleven, asserted that Plaintiff was improperly denied a pre- or post-deprivation hearing by an impartial body. It is clear that Plaintiff filed an appeal of his expulsion from the list of eligible candidates to the New Jersey Department of Personnel. After denial of his appeal, Plaintiff elected not to pursue an appeal to the Merit System Board. All of this information regarding Plaintiff's post-expulsion hearings were well-within the knowledge of her client and would have been revealed through a cursory investigation. Even after Defendants laid out these essential facts in their summary judgment motion, Plaintiff's counsel paid no heed, again demonstrating indifference to her obligations under Rule 11. Plaintiff's other constitutional claims, reviewed in detail in this court's Opinion on the motion for summary judgment, *supra* section II.C.1.c., suffer from similar infirmities, as they were grounded in the mistaken belief that Plaintiff's failure to obtain employment with the S.C.P.D. was due

to discrimination and not Plaintiff's prior criminal record.

Plaintiff's state law contract and promissory estoppel claims likewise lacked evidentiary and factual support. A review of the facts with her client revealed that Defendants' offer of employment was plainly conditional. Certain portions of Plaintiff's Complaint actually reflect this knowledge. (Complaint ¶ 51). Yet, Plaintiff's counsel pursued three claims for breach of contract and promissory estoppel despite the knowledge that Plaintiff's conviction would bar him from employment and therefore preclude him from satisfying the condition precedent attached to the alleged contract. Furthermore, with regard to count thirteen, whereby Plaintiff alleged an invasion of privacy perpetrated by Defendants, it is clear that it was in fact Plaintiff, and not Defendants, who aired his grievances and the facts underlying his problems to the public via the October 30, 1992 letter directed to *Today's Sunbeam.*

Thus, it is patently evident that Plaintiff's counsel failed in her duty to "Stop, Think, Investigate, or Research," *see Gaiardo,* 835 F.2d at 482, before filing an extensive complaint based upon the facts adduced before this court.

■ Rule 11 requires that the signing attorney make a reasonable inquiry into the facts *and the law* of the case. Counts three and four sought damages for intentional and negligent infliction of emotional distress, and a portion of count thirteen did so as well. The prohibition against receiving damages for emotional distress from a municipality or a municipal employee is not of recent vintage. This prohibition is governed by state statute, *N.J.S.A.* 59:9–2(d), and by New Jersey Supreme Court precedent that was approximately seven years old at the time this suit was filed. *See Ayers,* 106 N.J. at 576–77, 525 A.2d 287; *PBA Local 38,* 832 F.Supp. at 820–21. Plaintiff's counsel's failure to make a reasonable inquiry into the clearly established law on the issue of damages for emotional distress contributed to the unnecessary length of motion practice, delay and increase in litigation costs.

Furthermore, Plaintiff's claims under the *Pierce* doctrine were similarly foreclosed. It is simply not reasonable to believe that New Jersey public policy would provide a cause of action against those who failed to hire a convicted felon as a police officer. A simple review of the *Pierce* case itself, or any of its progeny, would have revealed this practically self-evident legal conclusion.

This court is compelled to conclude that, under the objective standard provided for by Rule 11, Plaintiff's counsel failed to make the reasonable inquiry into the factual and legal basis grounding Plaintiff's Complaint. Plaintiff's counsel has failed to come forward with any facts that would justify this thirteen count Complaint. The situation before this court is one that Rule 11 was expressly designed to handle, a suit without proper factual foundation and one that is legally unreasonable—the truly "exceptional circumstance." *Ford Motor Co.,* 930 F.2d at 289. Much public expense has been incurred by these Defendants to meet the charges of Plaintiff's baseless vendetta.

Having found that plaintiff's counsel has violated Rules 11(b)(2) & (3) in the manifold ways described above, we must next determine whether to impose a sanction and, if so, what sanction is appropriate under Rule 11(c)(3). Prior to the amendment to Rule 11 in 1993, imposition of some sanction upon finding a violation was mandatory. The amendment expressed in Rule 11(c)(2) limits the nature of the sanction and requires exercise of the court's discretion. Rule 11(c)(2) provides as follows:

A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

The Notes of the Advisory Committee (1993 Amendment) provide in relevant part that

the proper considerations for determining a sanction:

> The rule does not attempt to enumerate the factors a court should consider in deciding whether to impose a sanction or what sanctions would be appropriate in the circumstances; but, for emphasis, it does specifically note that a sanction may be nonmonetary as well as monetary. Whether the improper conduct was wilful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants; all of these may in a particular case be proper considerations. The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons.

The purpose of Rule 11 sanctions is "to deter rather than to compensate," *id.*, and a monetary sanction may be paid as a penalty into court. Rule 11(c)(2), *supra.* Where, as in the present case, the sanction is imposed upon a motion, the sanction may direct payment of some or all the movant's reasonable attorneys' fees and other expenses incurred as a direct result of the Rule 11 violation. *Id.*

That there should be a sanction is evident here, arising from the circumstances that include a willful and prolonged assertion of claims having no basis in fact or law, by an attorney, accompanied by other delays arising from the attorney's non-responsiveness and failures to appear when required by the court. All of this has had an enormously wasteful effect on the time and expense of this litigation; indeed, all efforts to defend the entire case would have been unnecessary if counsel had not violated Rule 11, that is, if the case had not proceeded on the demonstrably false premise that the defendants could have hired plaintiff as a policeman despite his recent felony conviction for grand larceny and his ongoing term of probation.

■ Deterrence of similar misconduct, by plaintiff's counsel and others, plays an important part of a sanction. This court regrets that this sanction arises in the context of prosecuting a claim for relief under the Civil Rights Act and related statutes designed to redress racial discrimination, because we do not wish to deter zealous advocacy of civil rights nor the advocacy of an extension of recognized rights. Indeed, Rule 11 does not sanction advocacy that merely misses the mark upon the merits or fails to persuade a court that existing law should be extended, so long as the argument is nonfrivolous. *See* Rule 11(b)(2), *supra.* By the same token, Rule 11 does not immunize frivolous or malicious civil rights complaints from the same scrutiny applied to pleadings in all federal civil cases. In each case, all counsel must abide by the strictures of Rule 11. The "effective deterrence" standard of Rule 11(c)(2) is met in this case because attorneys who fail to withdraw baseless claims should know they may risk personal financial consequences for the harm they cause to innocent litigants. For all these reasons, the court will choose to impose a monetary sanction, finding the nonmonetary sanctions (such as striking the pleadings, issuing an admonition or reprimand or requiring participation in ethical or other education seminars, *see* Fed. R.Civ.P. 11 advisory committee's note (1993)) to be inadequate under these circumstances.

■ Accordingly, this court finds it appropriate to award Rule 11 sanctions to Defendants for the reasonable costs and attorney's fees incurred as a result of the institution of this lawsuit. Defendants are hereby required to submit and serve an Affidavit of Costs and Fees for the amount claimed in connection with defending this lawsuit within fourteen (14) days of the date of this Opinion. Plaintiff's counsel

shall have seven (7) days thereafter to submit opposition, if any, to the amount sought by Defendants.[16] This court shall then determine the reasonable amount of the costs and fees without further hearing. However, this opportunity to challenge the amount of costs and fees claimed by the defendants is not an opportunity for Plaintiff's counsel to challenge the award of Rule 11 sanctions generally, since this issue was already joined in the motion before the court and now it has been adjudicated herein.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is hereby granted as to counts one through thirteen. In addition, Defendants' motion for fees and costs pursuant to Fed.R.Civ.P. 11, subject to the provisions outlined above, is likewise granted.

---

16. In this response, Plaintiff's counsel may present any "mitigating factors" that should be considered by this court in determining the final amount of the Rule 11 sanction. *Doering,* 857 F.2d at 195–96. At that time, the court can determine whether "the financial resources of the responsible person" should limit Defendants' recovery to less than full reimbursement of reasonable attorney's fees and costs incurred, as reflected in the Advisory Committee Note, *supra.*