CALIFORNIA NATURAL,
INC., Plaintiff,

v.

NESTLE HOLDINGS, INC. and Nestle
Enterprises, Inc., Defendants.

NESTLE HOLDINGS, INC., Counter-
claimant and Third-Party Plaintiff,

v.

CALIFORNIA NATURAL, INC.,
Counterdefendant,

and

Thomas F. Flynn and Drexel Biddle,
Flynn, Kumar and Ruggles, Inc.,
Third-Party Defendants.

Civ. A. No. 84–2222.

United States District Court,
D. New Jersey.

March 31, 1986.

William M. Antinore, Reiners & Davis, Haddonfield, N.J., and Jeffrey R. Lerman, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for plaintiff.

John J. Mulderig, Brown & Connery, Camden, N.J., and Terrence C. Sheehy, Pe-

ter E. Moll, David C. Eddy, Howrey & Simon, Washington, D.C., for defendants.

BROTMAN, District Judge.

California Natural, Inc. ("CNI") is a food processing firm located in Westville, New Jersey. This action arises out of a series of negotiations which occurred between August, 1983 and January, 1984 involving CNI and defendants Nestle Holdings, Inc. and Nestle Enterprises, Inc. ("Nestle"). During this period, the parties contemplated a complex transaction whereby Nestle was to acquire CNI. On January 25, 1984, Nestle informed CNI that it had decided against such action. Plaintiff then filed this lawsuit alleging breach of contract, promissory estoppel, and fraud. The court's jurisdiction is founded on diversity of citizenship. 28 U.S.C. § 1332. Presently before the court are cross-motions for summary judgment on the issue of liability as to all three causes of action asserted in the complaint.

## I. Factual Background

The factual history of this case is lengthy and complex, but a full recital is important to the parties' cross-motions for summary judgment. CNI is a small company founded in 1981, and principally engaged in the sale and development of "all-natural fruit and ice cream bars and other premium desserts." Complaint at ¶ 7. In late August 1983, CNI and Nestle began discussions concerning the possibility of Nestle purchasing CNI or substantially all of CNI's assets. See, e.g., id. at ¶ 16; Deposition of Thomas F. Flynn, Vice-President, CNI, at 22–23. Extensive discussions continued through the early fall of that year. See, e.g., Dictation Tape of James M. Biggar, President, Nestle Enterprises, September 23, 1983 (discussing on-going negotiations with CNI).

During the fall negotiations, Biggar was informed that due to CNI's financial needs the company required that it have a firm commitment concerning the buyout's financing by the middle of October. Biggar Deposition Transcript (Dep.Tr.) at 57. According to CNI, these negotiations culminated in a series of meetings on October 19, 1983. Plaintiff's breach of contract claim rests on the premise that the parties entered into a binding oral purchase agreement on that date during a meeting between Biggar, the President of Nestle, and Thomas G. Cullen, the President of CNI. See Cullen Dep.Tr. at 435–40, 459–60.

Plaintiff argues that Biggar and Cullen agreed upon all the essential terms of an oral contract on October 19 and that the parties intended to be bound by that agreement. Cullen Dep.Tr. at 469–71, 736–37; Deposition of George Stephen, investment broker, CNI, at Tr. 204–05. According to Cullen, all that remained to be ironed out were "formalities." Cullen Dep.Tr. at 469–71. In Cullen's view, a deal had already been set. See also Flynn Dep.Tr. at 326 ("In my mind the deal was done. They had reached an agreement."); Stephen Dep.Tr. at 208, 280–81.

Nestle vigorously disputes CNI's contention that the parties entered into an oral agreement on October 19, 1983 for Nestle to purchase CNI. Rather, it contends that the October 19 meeting was merely one additional step in the lengthy negotiating process. According to Nestle the parties agreed on October 19 that no "definitive binding acquisition agreement" would be completed until the parties had signed a written letter of intent, negotiated and executed an asset purchase agreement and there had been an audit of CNI. See Nestle Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Nestle Memorandum No. 1") at 5–6. These are the steps Cullen and Flynn viewed as mere formalities rather than prerequisites for a binding agreement.

Plaintiff also claims that the oral agreement between Cullen and Biggar contained all of the terms necessary to constitute a valid contract. According to CNI, the parties agreed on matters such as the price Nestle would pay for shares of CNI stock; additional payments based on future company earnings ("earn-out"); and the transaction fee. As evidence of which terms

were agreed upon, CNI points to deposition testimony of its executives and a memorandum of Flynn's from November 1, 1983, a dictated memorandum of Biggar's from October 27, 1983, and the Letter of Intent signed by both parties on November 28, 1983. CNI emphasizes that these writings are evidence of the binding oral agreement of October 19, 1983, and are not themselves binding contracts. *See, e.g.,* CNI's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("CNI Memorandum No. 2") at 36–39.

Nestle disputes CNI's contention regarding the terms for agreement and insists that the differences among Biggar's October 27 memo, the first draft of the Letter of Intent on November 4, and the final Letter of Intent on November 29 are evidence that no final agreement was reached on October 19. See Nestle Memorandum No. 1 at 5–9.

Both parties acknowledge that more meetings between their representatives occurred between the October 19 Cullen-Biggar meeting and the date of the final Letter of Intent, which CNI signed on November 29. Nestle characterizes these meetings as a continuation of an on-going negotiation process between the parties. *See, e.g.,* Nestle's "Statement of Undisputed Facts" at 17–35. CNI contends, however, that most of Nestle's work at that point was delegated by Biggar to Frank Carpenter, whose duty was merely to "complete the necessary paperwork" and to "coordinate the closing process." *See* CNI's Memorandum in Support of its Motion for Summary Judgment ("CNI Memorandum No. 1") at 18; Frank Carpenter Memorandum, Plaintiff's Exhibit 30 in Appendix to CNI Memorandum No. 1. Again, according to CNI the "deal" had already been completed.

During the period when CNI and Nestle representatives were meeting between October 19 and November 29, 1983, CNI also engaged in discussions with another poten-

tial buyer for its stock or assets—Cummins Diesel Engines, Inc. *See* Notes of Dennis Moore, Vice-President, CNI, at 1, Marked as Defendant's Exhibit "Moore 22." For example, Cullen and Moore met with several Cummins Executives in November to discuss the possible purchase of CNI. *See* Cullen Dep.Tr. at 982–83; Moore Deposition at Tr. 315–16. At this meeting Moore told the Cummins representatives that CNI was "negotiating with another company and that time was of the essence. That we were soon to sign a letter of intent [with Nestle], and once we got to that point they would not have any more chance." Moore Dep.Tr. at 321. The Cummins-CNI discussions continued until November 21, when Cummins advised CNI that it was no longer interested.[1]

CNI admits that it had these discussions with Cummins, but claims that it was forced to do this due to "erratic" behavior by Carpenter which led CNI to question Nestle's own intentions regarding the acquisition. *See* Cullen Dep.Tr. at 64, 732.

CNI received a new draft of the Letter of Intent on November 21. After several changes by CNI, the final Letter of Intent was signed on November 29. *See, e.g.,* Cullen Letter to Carpenter, November 25, 1983, Marked as Defendant's Exhibit "Cullen–29."

The Letter of Intent itself is another major point of contention between the parties. CNI asserts that the Letter contains the "material terms of the acquisition agreement" which it argues was already concluded. CNI Memorandum No. 1 at 2. By contrast, Nestle contends that this Letter of Intent may not be used as any evidence of a binding oral agreement. Defendants rely on ¶ 11 of the Letter of Intent, which states that

this letter constitutes only a Letter of Intent and a statement of our present intentions regarding the transactions set forth above, and *neither constitutes nor should be construed as evidence of any*

---

1. CNI renewed sale discussions with Cummins in December 1983 and January 1984, despite promises in the Letter of Intent with Nestle that

it would not engage in such discussions. *See* Deposition of William Gemmill, Vice-President, Cummins, at Tr. 57–62.

*form of offer or binding contract* (emphasis added).

This section of the Letter also provides that the "consummation of the transactions" proposed in the Letter would be "expressly subject" to the execution of an asset purchase agreement and a number of other conditions including approval by Nestle's Board of Directors and an accounting review of CNI. Finally, Nestle argues, this Letter contains several examples of "material" items requiring future negotiation.[2] Nestle asserts that the Letter represents strong evidence that the parties lacked any binding agreement by November 29, 1983.

After the parties signed the Letter of Intent, CNI's Board of Directors met to discuss the "ongoing negotiations to sell the [CNI] assets" to Nestle. Minutes of Meeting of [CNI] Board of Directors, December 8, 1983, Marked as Defendants' Exhibit "Flynn–172." At that meeting the Board "ratified, approved and affirmed" the Letter of Intent and "authorized and directed" CNI's officers to "negotiate the sale of the assets of CNI to Nestle." *Id.* There is no mention of any CNI–Nestle oral agreement in the Board minutes.

During December, Nestle's lawyers drafted the asset purchase agreement called for in the Letter of Intent. They sent a draft to CNI on January 5, 1984. Plaintiff has complained about the amount of time that elapsed before it received this draft. Cullen wrote a letter in the interim to Carpenter expressing CNI's concern about this delay and his uncertainty over Nestle's "intentions." Letter of Cullen to Carpenter, January 3, 1984 at 5. The parties debated the content of this agreement during January. *See, e.g.,* Discussion in Nestle's "Statement of Undisputed Facts" at ¶ 76. According to Nestle, some issues concerning the agreement were never resolved. CNI asserts, however, that nothing on its part prevented the deal or the asset purchase agreement from being completed. Flynn Dep.Tr. at 473.

On January 25, 1984, Carpenter called Cullen to inform him that Nestle had decided not to go forward with the CNI acquisition. Nestle contends that a number of factors weighed into this decision, such as an analysis of "Nestle's audit and legal review of CNI's financial statements, business records and trademarks and ... CNI's products and product claims." Nestle's "Statement of Undisputed Facts" at ¶ 80, n. 10. CNI claims that this decision by Nestle was not based on any newly acquired information about CNI, but rather on an altered assumption about the frozen fruit bar market based on further "reflection and business judgment." See Deposition of Robert McGuigan, President, Stouffers (Nestle subsidiary), at Tr. 53; Carpenter Dep.Tr. at 209. According to CNI, the audit produced no new relevant information on CNI. Carpenter Dep.Tr. at 5.

Another fact upon which CNI places great weight is the internal "Winning Strategy Memo" written by Carpenter. Plaintiff's Exhibit P49–Carpenter; *see* Carpenter Dep.Tr. at 160–61. In this note Carpenter writes that Nestle should "prolong the decision-making process, ... find out how desperate [CNI's] condition is," and "buy [CNI] from the bankruptcy court" if it folds. It is not clear when this note was written, nor is there evidence that the note was circulated among other Nestle employees. Nevertheless, CNI asserts that this note is evidence of a "scheme" by Nestle to bargain in bad faith and not to carry out the acquisition agreement with CNI. *See* CNI Memorandum No. 1 at 6–11.

---

**2.** Items in the Letter of Intent which Nestle relies on in its argument include:

¶ 2b: liabilities which "shall be agreed upon"

¶ 5: Nestle "will assume the prospective performance obligations of CNI under such leases—which are agreed to by [Nestle]"

¶ 6: Mr. Cullen's employment contract "shall contain ... items and matters mutually agreed upon"

¶ 7: A phantom stock plan "will be developed" Letter of Intent, November 28, 1983. *See* Nestle's Memorandum in Support of its Motion for Summary Judgment ("Nestle Memorandum No. 2") at 17–18.

## II. Standard for Summary Judgment

The standard for granting summary judgment is a stringent one. Rule 56(c), Fed.R.Civ.P., provides that summary judgment may be granted only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Special Jet Services, Inc. v. Federal Insurance Co.,* 643 F.2d 977 (3rd Cir.1981); *Ely v. Hall's Motor Transit Co.,* 590 F.2d 62 (3rd Cir.1978). In deciding whether an issue of material fact does exist, the court is obligated to view all doubt in favor of the nonmoving party. *Tomalewski v. State Farm Insurance Co.,* 494 F.2d 882 (3rd Cir.1974); *Smith v. Pittsburgh Gage and Supply Co.,* 464 F.2d 870, 874 (3rd Cir.1972). The court's role on a summary judgment motion is merely to identify the existence of factual issues, not to weigh the strength or the credibility of the evidence. *See, e.g., Huddell v. Levin,* 537 F.2d 726, 737 (3rd Cir.1976); *Ferdinand v. Agricultural Insurance Co.,* 22 N.J. 482, 494, 126 A.2d 323 (1956).

▆▆ Although the burden of proof on a motion for summary judgment lies with the moving party, the opposing party

> may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). The court must rule "on the record the parties have actually presented, not on one potentially possible." *Madeirense v. Stulman,* 147 F.2d 399 (2nd Cir.1945). *See Judson v. Peoples Bank & Trust Co. of Westfield,* 17 N.J. 67, 75, 110 A.2d 24 (1954). If a party fails to respond in the required manner, the court may, if appropriate, enter summary judgment against it.

## III. Analysis

### A. Breach of Contract Claim

#### 1. Existence of Oral Agreement

CNI's first claim against Nestle is for the breach of an alleged oral contract the parties entered into on October 19, 1983. The Restatement of Contracts states that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement of Contracts 2d § 17, at 51. A "manifestation of mutual assent to an exchange requires that each party either make a promise or begin to render a performance." *Id.,* § 18, at 53.

▆▆ Mutual "assent" depends upon the intent of the parties. Parties may effectively bind themselves orally if they agree on the "essential terms" of the contract and intend to be bound by those terms. *See Berg Agency v. Sleepworld-Willingboro, Inc.,* 136 N.J.Super. 369, 373–74, 346 A.2d 419 (App.Div.1975). The key factor is not whether every detail normally associated with a contractual undertaking has been included in an agreement between the parties. The presence of such detail is merely an "element in the evidential panorama underlying a factual finding of intent and enforceability."[3]

In the case at bar CNI seeks to enforce the alleged oral agreement of October 19, 1983. Although both parties subsequently signed a Letter of Intent, CNI claims that the parties intended to and in fact did enter into a binding agreement before that document was signed.

Nestle has produced an enormous amount of evidence, including the Letter of Intent, to support its contention that it

---

**3.** A threshold consideration for this court is which law to apply in this case. The parties have not examined this issue in detail. In New Jersey, the "validity of a contract is to be determined by the law of the place of contract." *Colozzi v. Bevko,* 17 N.J. 194, 204, 110 A.2d 545 (1955). In the case at bar the parties entered into an alleged oral agreement in Ohio, but plaintiff signed a Letter of Intent in New Jersey and the parties negotiated and contemplated performance in New Jersey. Under these circumstances, and the presence of the fraud claim as well, the court deems that New Jersey law is most appropriate. An initial review of Ohio law indicates a close parallel with New Jersey law in any case.

never reached a binding oral agreement with CNI. It asserts that the October 19 meeting was merely one session in a lengthy negotiating process which never came to fruition. The language in the Letter of Intent and the behavior of both sides throughout the fall and early winter of 1983–1984 do strongly indicate that neither side viewed the October 19 meeting as the culmination of a binding oral agreement.

Despite all the evidence Nestle has introduced, CNI has responded with evidence of its own. Plaintiff relies on the deposition testimony of its executives Thomas G. Cullen, Thomas F. Flynn and Dennis G. Moore; the testimony of its investment adviser George Stephen; and the memoranda written and dictated by Flynn and Nestle executive James M. Biggar respectively. Based on the personal knowledge of the CNI representatives, CNI contends that Nestle and CNI did have a binding oral purchase agreement on October 19. Plaintiff asserts through its evidence that both sides intended to enter into the contract on that date and it was not until later that Nestle began to back away from its commitment.

■ The above discussion indicates the presence of a material issue of fact. Despite wide discrepancy between the relative amounts of the evidence presented, a court's role at the summary judgment stage is merely to *identify* factual issues, not to weigh the credibility or strength of the evidence. That task must be left to the jury. *See Huddell v. Levin, supra; Ferdinand v. Agricultural Insurance Co., supra*. The court cannot determine as a matter of law that there was no oral agreement between the parties as of October 19, 1983.

### 2. Application of the Statute of Frauds

■ Assuming *arguendo* that the parties did enter into an oral agreement, the court must still make the legal determination of whether the statute of frauds restricts the enforceability of the agreement. The New Jersey statute of frauds provides in relevant part that

*a contract for the sale of personal property is not enforceable* by way of action or defense beyond five thousand dollars in amount or value of remedy *unless there is some writing which indicates that a contract for sale has been made* between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought by his authorized agent.

N.J.S.A. 12A:1–206 (emphasis added). A contract for the sale of "personal property" includes the sale of a business and its assets. *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1144–45 (3rd Cir. 1972), *citing* N.J.S.A. 12A:1–206. The agreement in the case at bar clearly represents such a sale of personal property and thus will be unenforceable beyond $5000 unless this court determines that there is a writing that sufficiently indicates that "a contract for sale has been made."

■ The writing necessary to overcome the statute of frauds must

reasonably prove the existence of a contract obliging the defendant to buy or sell goods, and show enough of the contractual terms to assure a reasonably certain basis for giving appropriate relief to the parties.

N.J.S.A. 12A:2–201(1). The satisfaction of the statute of frauds is a legal determination. The parties do not disagree about the factual evidence on this issue. CNI relies on three writings which it asserts satisfy the statute of frauds. These are the Letter of Intent, the Flynn memorandum, and the Biggar dictated memorandum.

■ The Letter of Intent clearly cannot satisfy the statute of frauds. The Letter itself explicitly states that it "neither constitutes nor should be construed as evidence of any form of offer or binding contract." Letter of Intent at ¶ 11. Furthermore, the Letter states that the completion of the "transactions" proposed in the Letter was "expressly subject" to a number of conditions. *Id.; see Factual Background, supra.* Although the Letter was signed by

Nestle, its very language precludes its use as proof of the existence of a binding contract.

 The Flynn memorandum was prepared by CNI executive Thomas Flynn and no agent of Nestle's either assisted with the preparation of or signed it. Therefore, this writing as a matter of law cannot satisfy the statute of frauds. N.J.S.A. 12A:1–206; *Huyler Paper Stock Co. v. Information Supplies Co.*, 117 N.J.Super. 353, 363–63, 284 A.2d 568 (Law Div.1971) (the signature requirement is "essential" under the statute of frauds).

 Finally, CNI rests its compliance with the statute of frauds on the transcribed memorandum of a dictation by James Biggar. This memorandum does refer to several terms of "the deal that [Frank] Carpenter had negotiated with Tom Cullen," such as the division between "passive" and active CNI shareholders, the price per share of stock to each group, and the amount of earnout. However, the memorandum is labeled only "Per JMB dictation tape 10/27/83." Biggar never signed this memorandum, and never sent it to CNI for its review or approval. It was no more than a hastily prepared internal memorandum and the statute of frauds writing requirement does not encompass this type of writing. Absent a signature or at least more definitive indication that a "contract for sale has been made between the parties," this memorandum as a matter of law does not satisfy the statute of frauds. *See Trilco Terminal v. Prebilt Corporation*, 167 N.J.Super. 449, 451, 400 A.2d 1237 (Law Div.1979), *aff'd*, 174 N.J. Super. 24, 415 A.2d 356 (App.Div.1980); *Huyler Paper Stock Co. v. Information Supply Co., supra.*[4]

Based on an analysis of the memoranda submitted by CNI, the court holds as a matter of law that CNI has not satisfied the statute of frauds through a writing. CNI contends, however, that it has satisfied the statute of frauds due to the doctrine of promissory estoppel.

### 3. Satisfaction of Statute of Frauds Through Promissory Estoppel

 A party can avoid the application of the statute of frauds and enforce an otherwise unenforceable oral agreement through the doctrine of promissory estoppel. A prima facie case of promissory estoppel requires:

(1) a clear and definite promise by the promisor;

(2) the promise must be made with the expectation that the promisee will rely thereon;

(3) the promisee must in fact reasonably rely on the promise; and

(4) detriment of a definite and substantial nature must be incurred in reliance on the promise.

*The Malaker Corp. v. First Jersey National Bank*, 163 N.J.Super. 463, 479, 395 A.2d 222 (App.Div.1978).

This is another area in which Nestle has presented strong evidence to support its argument that CNI failed to create a genuine issue of material fact. For example, its evidence of a lengthy and complex negotiating process creates great doubt that it ever made a "clear and definite promise" to purchase CNI. The exchange of draft Letters of Intent also strongly supports the view that any reliance by CNI on a Nestle promise was not "reasonable." Despite such evidence, however, a factual issue remains on all elements of the promissory estoppel defense.

 CNI has presented sufficient evidence to avoid summary judgment on the estoppel issue. First, its deposition testimony creates a factual issue as to whether

---

4. One exception to the signature requirement is when there is a transaction between merchants and the party seeking to enforce the contract must have sent a "writing in confirmation of the contract" to which there was no objection from the opposing party within 10 days of the party's receipt of the writing. N.J.S.A. 12A:2–201(2); *Trilco Terminal v. Prebilt Corporation, supra* 167 N.J.Super. at 451, 400 A.2d 1237. There was no exchange of the Biggar memorandum in this case.

there was a "clear and definite" promise made by Biggar to Cullen on October 19, 1983. This same testimony creates a factual issue on Nestle's alleged expectations of CNI's reasonable reliance on that promise. CNI claims that it relied on Nestle's promise by terminating or not pursuing discussions with other potential purchasers of CNI. Finally, CNI contends through deposition testimony that it lost "credibility" and "customers" due to Nestle's refusal to complete the acquisition agreement. This creates a factual issue of a real detriment to CNI stemming from its reliance. *See generally* CNI Memorandum No. 1 at 11–15.

In seeking summary judgment on the promissory estoppel issue, Nestle relies in large part on the decision in *Chromalloy American Corp. v. Universal Housing Systems of America, Inc.*, 495 F.Supp. 544 (S.D.N.Y.1980), *aff'd mem.*, 697 F.2d 289 (2nd Cir.1982). In that case the district court held that as a result of "written disclaimers of contractual liability which were made, any reliance on the existence of an ... agreement [based on a prior oral promise] was unreasonable." 495 F.Supp. at 551. Consequently, the court rejected the attempted use of the promissory estoppel doctrine by the party seeking to enforce the agreement. That case is distinguishable from the one at bar, however, because the court relied on "undisputed facts" indicating "conclusive evidence of an intent to be bound *only* by a formal writing." *Id.* at 550 (emphasis added). As noted several times, CNI and Nestle are in dispute about whether there was such intent in this case. Courts that have rejected the promissory estoppel defense have usually based that decision on full fact findings. *See, e.g., Transport Management Co. v. American Radiator and Standard Sanitary Corp.*, 326 F.2d 62 (3rd Cir.1963). Until all factual issues are resolved in the case at bar, the court cannot rule as a matter of law that CNI's reliance was unreasonable.

■ For all the above reasons, the court will deny the motions for summary judgment relating to the breach of contract

claim. The existence of an oral agreement remains an open factual issue. As a result of the statute of frauds, however, this alleged agreement is unenforceable beyond $5000 unless plaintiff prevails in demonstrating all the elements of the doctrine of promissory estoppel. The court holds as a matter of law, however, that the statute of frauds applies and that CNI has not satisfied it through a sufficient writing.

**B. Fraudulent Misrepresentation Claim**

In New Jersey there are five necessary elements to maintain an action for fraudulent misrepresentation:

(1) a representation by defendant to the plaintiff with intent that the latter party rely upon it;

(2) knowledge on the part of the defendant that the representation is in fact false;

(3) belief by the plaintiff that the representation is true;

(4) reliance on such representation; and

(5) the taking of action and consequent injury.

*Thomas v. Duralite Company*, 386 F.Supp. 698 (D.N.J.), *aff'd in part, rev'd in part on other grounds and vacated*, 524 F.2d 577 (3rd Cir.1975); *accord Chatlos Systems v. National Cash Register Corp.*, 479 F.Supp. 738, 748 (D.N.J.1979), *aff'd in part, rem'd in part on other grounds*, 635 F.2d 1081 (3rd Cir.1980).

A "false representation of an existing intention, i.e., a 'false state of mind,' with respect to a future event or action has been held to constitute actionable misrepresentation." *Capano v. Borough of Stone Harbor*, 530 F.Supp. 1254, 1264 (D.N.J.1982), *quoting Samatula v. Piechota*, 142 N.J.Eq. 320, 60 A.2d 86 (Ch. 1948). Defendant's lack of intention of fulfilling the promise may be shown "circumstantially by ... subsequent acts and by subsequent events or by evidence that the statement was impossible to fulfill based upon contingencies or circumstances known to the promisor at the time of the statement but

**474**

unknown to the promisor at the time of the statement but unknown to the promisee." *Capano, supra,* 530 F.Supp. at 1264.

█ In the case at bar, CNI's fraudulent misrepresentation claim closely resembles its promissory estoppel claim. In addition to the proof relied on for that claim, however, CNI also points to Flynn's "Winning Strategy Memo" as evidence that Nestle had no intention of fulfilling its alleged promise of October 19, 1983. CNI alleges that Nestle withheld from CNI its intent to pressure CNI into near-collapse. This evidence, combined with the testimony discussed earlier, combines to create at least an issue of fact on the elements for fraudulent misrepresentation. Again, the court notes that by this decision it is not making a determination regarding the relative weight and credibility of the evidence produced by each side. Such decision is beyond the scope of this court's role.

In sum, the court will deny the cross-motions for summary judgment on plaintiff's fraudulent misrepresentation claim.

### C. Punitive Damages Claim

█ Count IV of CNI's complaint alleges that Nestle "acted willfully, wantonly, outrageously and with reckless disregard for the rights of California Natural," and prays for an award of punitive damages. Complaint at ¶ 42. Nestle correctly points out that in New Jersey there is no independent cause of action for punitive damages. *See O'Connor v. Harms,* 111 N.J.Super. 22, 30, 266 A.2d 605 (App.Div.1970); *Barber v. Hohl,* 40 N.J.Super. 526, 534, 123 A.2d 785 (App.Div.1956). The court will not treat CNI's claim for punitive damages as a separate cause of action, but will consider this as part of the substantive claims for damages. Therefore, the court will not dismiss Count IV of the complaint and will deny the cross-motions for summary judgment.

### III. Conclusion

Based on the submissions and arguments of the parties, the court has made the following decisions. First, the court will deny the cross-motions for summary judgment on plaintiff's breach of contract and promissory estoppel claims. Any oral agreement which may have been reached will not be enforceable beyond $5000 unless plaintiff proves the applicability of the doctrine of promissory estoppel. Second, the court will deny the cross-motions for summary judgment on plaintiff's fraudulent misrepresentation claim. Third, the court will deny the cross-motions for summary judgment on the punitive damages claim.

The court will enter an appropriate order.