AIRCRAFT INVENTORY CORPO-
RATION, a North Carolina
Corporation, Plaintiff,

v.

FALCON JET CORPORATION,
a Delaware Corporation,
Defendant.

Civ. Action No. 96–5350(MTB).

United States District Court,
D. New Jersey.

May 18, 1998.

David Kenneth DeLonge, Schumann, Hanlon, Doherty, McCrossin & Paolino, Jersey City, NJ, for Plaintiff.

Gregory C. Parliman, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Defendant.

### OPINION

BARRY, District Judge.

This matter comes before the court on a motion for summary judgment filed by defendant, Dassault Falcon jet Corporation ("Dassault Falcon Jet" or "defendant"), incorrectly referred to in the complaint as "Falcon Jet Corporation." Answer at 1. Defendant contends that both claims asserted by plaintiff Aircraft Inventory Corporation ("AIC" or "plaintiff"), namely breach of contract and promissory estoppel, must fail as a matter of law. This court agrees and, for the following reasons, defendant's motion will be granted.

### I. STATEMENT OF THE CASE

Dassault Falcon Jet sells its own line of executive business jets and AIC buys, sells, leases and occasionally brokers aircraft. This dispute centers around an alleged oral contract between Dassault Falcon Jet and AIC—or, failing that, an alleged promise by Dassault Falcon Jet—regarding the sale of a Cessna Citation III, Serial Number 73 ("Citation III–73") for $3.1 million.

In the fall of 1993, Al Carrier, a regional manager for Dassault Falcon Jet, initiated negotiations with J.B. Scott concerning

Scott's purchase of a new Falcon 900 jet from Dassault Falcon Jet and a trade-in of Scott's used Cessna Citation III–73 as part of the transaction. Carrier Dep. at 10, 11. In early 1994, Carrier informed Robert Morgan of Sacramento Aviation, a buyer, seller, and broker of aircraft and a friend of Carrier's for over 19 years, that Dassault Falcon Jet might be receiving a Citation III as a trade-in. Morgan Cert. ¶¶ 1, 2; Carrier Dep. at 22–23. Morgan told Carrier that he was very interested in inspecting the Citation III–73 and perhaps making an offer on it. Carrier Dep. at 23; Morgan Cert. at ¶ 2.

On May 16, 1994, Carrier flew to Boise, Idaho where the Citation III–73 was located, intending to show it to Morgan. Carrier Dep. at 23. Upon arriving at his hotel, Carrier was given a telephone message from Morgan stating that he would not be able to view the aircraft but that a man by the name of Gary Bannister, President of AIC, would be there instead. Id.; Morgan Cert. at ¶ 3.

On the morning of May 17, 1994, Bannister arrived from Florida and met with Carrier for the purpose of viewing the Citation III–73. Carrier Dep. at 23–25; Bannister Dep. at 42; Morgan Cert. at ¶ 3. Over breakfast, before even seeing the plane or its records, Bannister allegedly told Carrier that he was interested in buying the plane, but not interested in setting a market value on it. Bannister Dep. at 52. In other words, Bannister contends, he did not want his offer to be shopped around so that a slightly higher offer from someone else could eventually be obtained. Id. at 52–53. Bannister asserts that Carrier responded that he needed a "firm bid" so that he knew where he could sell the airplane once the Scott deal came together. Id. at 53.

Carrier and Bannister then drove to the airport to view the Citation III–73. Over a two hour period, Bannister examined the plane, the logbooks, the Cesscom report, and the service bulletins. Carrier Dep. at 25–26; Bannister Dep. at 55.

Bannister asserts that over lunch Carrier asked him to make an offer on the plane. Bannister Dep. at 56. Bannister also asserts that Morgan told him before he flew to Boise that Carrier had said that a $3.0 million offer on the Citation III–73 would "make the deal." Morgan Cert. at ¶ 4; Bannister Dep. at 48–49. As a result of what Morgan told him, Bannister offered to pay $3 million for the plane. Carrier allegedly replied, "I don't believe I can make that work. I need a little bit more." Bannister Dep. at 56. Bannister asserts that he then said, "Tell me what you need to put your deal together and I'll make you a non-shop price. In other words, I'll make you a price if you agree not to shop my offer." Id. Carrier allegedly responded, "I need 3.1 million to put my deal together" and Bannister then said, "I agree. I'll take it." Id. Carrier told Bannister to send a letter "accepting the airplane" to Neil MacDonald, Vice President of Marketing, and Bannister returned home. Id. at 57.

The next day, May 18, 1994, Bannister claims to have faxed a draft of his letter to Carrier's hotel room in Boise for his approval. Id. Carrier allegedly faxed it back to Bannister and said, "Gary they're all sitting in the office in New Jersey. They're waiting on your letter. We're going to go with your numbers. If we get the airplane bought, it's your airplane. If we get our deal, it's your airplane. But MacDonald wants you to change the letter and send it to Skip Flint." Id. at 58. Bannister then changed the addressee to Skip Flint, Director of Pre–Owned Aircraft Sales for Dassault Falcon Jet, and faxed the letter at around 5:00 p.m. or 5:30 p.m. on May 18, 1994. Id. The letter read as follows:

Dear Mr. Flint:

This is to confirm our personal contact with Al Carrier regarding the purchase of Citation III, 650–0073 by this company, Aircraft Inventory Corp.

Subject to the use of a purchase agreement, containing terms and language which is commonly acceptable in the aircraft industry. AIC wishes to offer this letter of intent for your consideration.

AIC will pay the amount of Three Million One Hundred Thousand Dollars, USD, (3,100,000.00).

Upon written notification from Falcon Jet, Inc. that the above aircraft will be available for delivery within 45 days, AIC shall

place the amount of One Hundred Thousand Dollars ($100,000.00), in escrow with Morgan Aircraft Title Services, Inc. Such amount shall be dedicated to the purchase of this aircraft.

Falcon Jet would make the aircraft available for AIC to have a pre purchase survey completed at this time. The Survey and possible acceptance flight are to be conducted for the sole purpose of determining that the aircraft remains in a like condition as when first viewed by the representative of AIC on May 17, 1994.

We would appreciate hearing from you regarding this letter of intent as we do wish to include this transaction in our plans for a September purchase in 1994.

Sincerely,

/61s/61

Gary L. Bannister

President

Parliman Cert., Exh. 4 (hereinafter "May 19, 1994 Letter"). Flint did not respond to the letter, and believes he did not because the offer was not sufficiently attractive to warrant a response. Flint Dep. at 38.

Carrier recalls the events much differently. Carrier asserts that on May 17, 1994, when Bannister made the $3.0 million offer on the Citation III–73, Carrier simply inquired as to whether that was a fair price. Carrier Dep. at 33. When Bannister replied affirmatively, Carrier said that "if that's a fair price, then go a little bit higher and you'll probably get the aircraft. Because other offers would be coming in . . . ." *Id.* Bannister then offered $3.1 million. *Id.* At no point, says Carrier, did he ever agree not to shop the offer or request a firm offer. *Id.* at 29–30, 34. Indeed, according to Carrier, he told Bannister that he was not authorized to accept or say anything about an offer, and to submit his offer to the pre-owned division of Dassault Falcon Jet. *Id.* at 34. While Carrier does not recall any conversation with Bannister regarding who to send the letter to, he states that "it's possible" that he told Bannister to initially direct the letter to Mac-

Donald because he was Carrier's "direct boss," but that "it would have been a correct thing" to later tell Bannister to instead direct the letter to Flint. *Id.*

In any event, Carrier does not recall any conversations with Bannister after May 17. *Id.* at 36. Indeed, Carrier asserts that he never saw the May 18, 1994 letter directed to Flint—or any draft of the letter supposedly directed to MacDonald—until many months after it was received by Flint.[1] *Id.*

The next morning, May 19, 1994, Flint called Bannister's office and spoke with George Litchard, Bannister's associate at AIC. Bannister Dep. at 73; Litchard Cert. at ¶ 2. Flint supposedly confirmed to Litchard that Dassault Falcon Jet would not shop AIC's offer and if the Scott deal went through, AIC would get the Citation III–73. Bannister Dep. at 66–67; Litchard Cert. at ¶ 2. Flint did not speak with Bannister directly because Bannister was out of town, "probably looking at another Citation III." Bannister Dep. at 66. Flint concedes receiving the letter from Bannister on May 19, 1994 and recalls that he thereafter had a conversation with someone from AIC, but does not remember anything more than that a conversation took place. Flint Dep. at 5–6.

Finally, Morgan states that Carrier called and told him that Dassault Falcon Jet was accepting the $3.1 million offer of AIC and that "when [Dassault] Falcon Jet gets its deal, Aircraft Inventory gets the plane." Morgan Cert. at ¶ 3. Approximately one week later, Carrier again called, this time allegedly advising Morgan that the Scott deal had gone through and that the plane was committed to AIC. *Id.*

As one might expect because this lawsuit has been filed, AIC did not get the plane. On May 24, 1994, Scott signed a contract with Dassault Falcon Jet to purchase a Falcon 900 and trade in his Citation III–73. Carrier Dep. at 14–15. The day before, on May 23, 1994, Flint sent a memo to Jack Young, Senior Vice President of Finance for Dassault Falcon Jet, recommending that the Citation III–73 be placed on the market with

---

**1.** Although Carrier testified in his deposition that he did not see the May 18, 1994 letter until much later, defendant's brief states that Bannister

faxed the draft letter to Carrier on May 18, 1997 for his approval. Def.Br. at 6.

a $3.8 million retail price and, if unable to retail, a $3.0 to $3.1 million wholesale price. Parliman Cert., Exh. 7.

In mid-June 1994, Dassault Falcon Jet placed an ad for the Citation III–73 in the Wall Street Journal. Parliman Cert., Exh. 8. According to Bannister, Morgan saw the ad, called Bannister, and faxed him a copy. Bannister Dep. at 14–16. Bannister immediately called Flint and Flint allegedly told him that Dassault Falcon Jet was not going to "wholesale the airplane" and that if AIC wanted the aircraft, it would have to make a higher offer. *Id.* at 17. Bannister never made a subsequent offer. *Id.* at 19. On June 17, 1994, Dassault Falcon Jet sold the Citation III–73 to Duncan Aviation for $3.7 million pursuant to a Used Aircraft Purchase Agreement. Flint Dep. at 30–31.

Plaintiff filed a two-count complaint on Nov. 18, 1996 asserting breach of an oral contract and promissory estoppel. Defendant now moves for summary judgment asserting that the statute of frauds bars the enforcement of an oral contract and that plaintiff has not satisfied the elements of promissory estoppel.

## II. *DISCUSSION*

### A. *The Standard*

Summary judgment may be granted if, after consideration of such items as depositions, affidavits or certifications, and after viewing the facts in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Davis v. Portline Transportes Maritime Internacional,* 16 F.3d 532, 536 n. 3 (3d Cir.1994).

### B. *Breach of Contract Claim*

▮ AIC contends that it had an oral contract with Dassault Falcon Jet to purchase the Citation III–73 for $3.1 million. Dassault Falcon Jet asserts that while AIC may have submitted an offer or bid on the plane, no contract was ever formed. As a threshold matter, however, this court need not reach the issue of whether AIC merely submitted an offer which was ultimately rejected or whether the parties entered into an oral contract by mutually assenting to the "essential terms" of the contract, intending to be bound by those terms, *see Berg Agency v. Sleepworld–Willingboro, Inc.,* 136 N.J.Super 369, 373–74, 346 A.2d 419 (App.Div.1975) (parties effectively bind themselves when they agree on the essential terms of the contract and intend to be bound by those terms), because, even assuming that such an oral contract was entered into, enforcement is barred by the statute of frauds.[2]

The New Jersey statute of frauds provides in relevant part that:

[e]xcept as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforeacle by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

N.J.S.A. 12A:2–201(1).[3] Neither party disputes that the contract in question involves a sale of goods for over $500. However, the only writing between the parties with regard to the sale of the Citation III–73 is the May 18, 1994 letter from Bannister to Flint which is not signed by any representative of Dassault Falcon Jet, the party against whom enforcement is sought. *Huyler Paper Stock Co. v. Information Supplies Corp.,* 117 N.J.Super. 353, 363, 284 A.2d 568 (Law Div. 1971) (signature requirement is "essential" under statute of frauds); *see also Olefins Trading, Inc. v. Han Yang Chem Corp.,* 9 F.3d 282, 285 n. 2 (3d Cir.1993) (noting signature requirement under section 2–201(1)); *Michael Halebian N.J., Inc. v. Roppe Rubber*

---

**2.** Because the statute of frauds bars enforcement of the purported oral contract, this court need not reach the issue of whether Carrier had authority to accept Bannister's offer. *See* Pl. Opp.Br. at 6–7; Def.Br. at 6.

**3.** Neither party disputes that the agreement is governed by New Jersey law. *See* Def.Br. at 10; Pl.Opp.Br. at 15.

*Corp.,* 718 F.Supp. 348, 364 (D.N.J.1989) (same).

■ Plaintiff, while conceding that there is no signature on the part of Dassault Falcon Jet, argues that the "merchant's exception" to the statute of frauds should apply. Under that exception, when a transaction is one between merchants, a writing which is not signed by the party against whom enforcement is sought may nonetheless satisfy the statute. The party seeking to enforce the oral agreement must, however, have sent the opposing party, within a reasonable time, a "writing in confirmation of the contract" which is "sufficient against the sender." N.J.S.A. 12A:2–201(2). A sufficient confirmatory writing will satisfy the statute of frauds unless the recipient objects in writing within ten days of receipt. *Id.*[4]

AIC asserts that the May 18, 1994 letter was a confirmation of the oral agreement reached between the parties and that, having failed to object to the letter, Dassault Falcon Jet cannot now assert the statute of frauds defense. This court does not agree.

It is clear that Flint received the purported confirmatory writing within a reasonable time, had reason to know of its contents and lodged no objection. The issue here is whether the May 18, 1994 letter was a written confirmation of an oral contract sufficient against the sender or simply an offer or confirmation of negotiations. Because this court finds it to be the latter, the merchant's exception does not apply and the statute of frauds bars enforcement of any oral contract between the parties.

■ In New Jersey, a writing is "in confirmation of the contract" if it "indicate[s] that a binding or completed transaction has been made." *Trilco Terminal v. Prebilt Corp.,* 167 N.J.Super. 449, 454, 400 A.2d 1237 (Law Div.1979) (citation omitted), *aff'd,* 174 N.J.Super. 24, 415 A.2d 356 (App.Div.1980). While the writing need not expressly state that it is being sent in confirmation of a prior transaction, it must be such that "an ordinary merchant could ... surmise from a writing that its sender was asserting the existence of a contractual relationship between the parties...." *Id.*[5] Titled a "Letter of Intent," nothing in the May 18, 1994 letter indicates that AIC was confirming the existence of a contract between the parties. The letter is, instead, a typical offer stating expressly that "AIC wishes to offer this letter of intent for your consideration" and confirming only the "personal contact" with Carrier and not any sort of agreement reached between the parties. Parliman Cert., Exh. 4; *see R.S. Bennett & Co., Inc. v. Economy Mechanical Indus., Inc.,* 606 F.2d 182, 185 (7th Cir.1979) (letters containing language "offer for your consideration" insufficient); *Alice v. Robett Mfg. Co.,* 328 F.Supp. 1377, 1380 (N.D.Ga.1970) ("confirming our telephone conversation, we are pleased to offer" insufficient), *aff'd,* 445 F.2d 316 (5th Cir.1971). As further indications that the letter merely confirms pre-contractual negotiations, AIC requests a "pre-purchase survey," a "possible acceptance flight," and a response. Parliman Cert., Exh. 4.

Plaintiff counters that the conduct of the parties evidences the existence of a contract because Carrier confirmed on several occasions both to Bannister and Morgan that AIC would get the Citation III–73. Pl. Opp.Br. at 10. Bannister states that when Carrier told him to change the addressee of the letter to Flint, Carrier also accepted

---

4. N.J.S.A. 12A:2–201(2) states that

    [b]etween merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

5. New Jersey courts impose a higher standard for a confirmatory writing under § 2–201(2) than the writing required under § 2–201(1). *See Trilco,* 167 N.J.Super. at 454–55, 400 A.2d 1237. A

more exacting scrutiny of the confirmatory writing is necessary because the receiving merchant is being bound to a writing it did not sign, *id.,* and, without a requirement that the writing indicate a binding contractual relationship, the receiving merchant would be saddled with the onerous burden of responding to every unsolicited purchase order for fear that it might find itself bound. *Id.* at 454, 400 A.2d 1237; *but see Bazak Int'l Corp. v. Mast Indus., Inc.,* 73 N.Y.2d 113, 120, 123, 538 N.Y.S.2d 503, 535 N.E.2d 633 (1989) (rejecting stricter *Trilco* standard).

AIC's $3.1 million offer stating, "[we are going with your numbers. If we get our deal, you've got the airplane.]" Bannister Dep. at 65. When Bannister was asked at his deposition why he did not make any revisions to the letter to indicate that Carrier had, in fact, accepted his offer, Bannister replied that "at the time I didn't feel it was necessary." Bannister Dep. at 65–66.

█ Bannister was wrong. A confirmatory letter must contain language sufficient to indicate that the parties reached an agreement because extrinsic statements are immaterial to the issue of whether a writing is sufficient on its face to satisfy the statute of frauds. This court must look only to the document itself because "[c]onsideration of parol evidence in assessing the adequacy of a writing for Statute of Frauds purposes would otherwise undermine the very reason for a Statute of Frauds in the first instance." *Hymowitz v. Eli Lilly*, 73 N.Y.2d 487, 505, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989). Putting aside any conversations that allegedly took place and looking only to the May 18, 1994 letter, this court finds that an ordinary merchant would not view that letter as confirming a contractual relationship between the parties. Therefore, enforcement of the alleged oral contract between the parties is barred by the statute of frauds.

## C. *Promissory Estoppel Claim*

Plaintiff argues that even if the court finds that the parties never entered into a contract for sale of the Citation III–73 or that enforcement of any such contract is barred by the statute of frauds, it can nonetheless be awarded damages based on a theory of promissory estoppel. The argument is as follows: because plaintiff relied on defendant's promise to sell it the Citation III–73, it abandoned its opportunity to acquire for $3.55 million another Citation III which it had inspected in Florida on May 16, 1994 ("Citation III–85" or

"Orlando Citation III"). Pl.Opp.Br. at 19. When it learned in June that Dassault Falcon Jet would not sell the Citation III–73 to AIC for $3.1 million, plaintiff resumed negotiations with the owner of the Orlando Citation III and ultimately was able to purchase it at an increased price of $3.7 million. Therefore, because it suffered damages of $145,000 (the difference between $3.7 million and $3.55 million) [6] due to its reliance on defendant's promise to sell it the Citation III–73, the promise should be enforced. Pl.Opp.Br. at 19.

Defendant asserts, first, that promissory estoppel cannot be used to circumvent the statute of frauds and, second, that even if the statute of frauds does not bar the claim, plaintiff has failed to establish the four elements of a *prima facie* case of promissory estoppel.

Contrary to defendant's contention, while some courts refuse to allow promissory estoppel to override the statute of frauds,[7] "[t]he doctrine of promissory estoppel is well-established in New Jersey." *Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.*, 307 N.J.Super. 461, 468, 704 A.2d 1321 (App.Div.1998); *Watson v. City of Salem*, 934 F.Supp. 643, 661 (D.N.J.1995); *Malaker Corp. v. First Jersey Nat'l Bank*, 163 N.J.Super. 463, 479, 395 A.2d 222 (App.Div.1978), *certif. denied*, 79 N.J. 488, 401 A.2d 243 (1979). The *Restatement (Second) of Contracts*, § 139, expressly adopted as the law of New Jersey in *Mazza v. Scoleri*, 304 N.J.Super. 555, 560, 701 A.2d 723 (App.Div.1997), provides that

> [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise.

---

**6.** This court is unclear as to the exact price of the Orlando Citation III because, in his deposition, Bannister testified that its original purchase price was $3.3 million and that AIC eventually purchased it for $3.55. Bannister Dep. at 45, 47. In any event, AIC is essentially asserting that it was forced to pay more for the plane because of its reliance upon defendant's promise.

**7.** *See, e.g.,* Michael T. Gibson, *Reliance Damages in the Law of Sales Under Article 2 of the Uniform Commercial Code*, 29 Ariz.St.L.J. 909, 946 (1997) (listing cases which reject use of promissory estoppel to override § 2–201); Michael Gibson, *Promissory Estoppel, Article 2 of the U.C.C., and the Restatement (Third) of Contracts*, 73 Iowa L.Rev. 659, 690 n. 238 (1988) (same).

*Restatement (Second) of Contracts*, § 139(1) (1979); *see also California Natural, Inc. v. Nestle Holdings, Inc.*, 631 F.Supp. 465, 472–73 (D.N.J.1986) (allowing promissory estoppel to satisfy the statute of frauds).

■ The elements of promissory estoppel are as follows:

(1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise; and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise.

*Malaker*, 163 N.J.Super. at 479, 395 A.2d 222; *Watson*, 934 F.Supp. at 661. Dassault Falcon Jet argues that there was no "clear and definite promise" because the alleged representations were "conditional and contingent" upon the Scott transaction and lacked specificity with respect to conditions of the sale. Def.Br. at 19, 20. It also argues that AIC has not established detrimental reliance sufficient to warrant enforcement of the promise. This court agrees.

■ First, the promise upon which AIC allegedly relied was not sufficiently clear and definite. *See Malaker*, 163 N.J.Super. at 479, 395 A.2d 222 (a clear and definite promise is the *"sine qua non* for the applicability of [promissory estoppel]"). Defendant purportedly made two oral promises: (1) on May 18, 1994, Carrier allegedly told Bannister on the phone that "[we] are going with your numbers. If we get [the Scott] deal, you've got the airplane," Bannister Dep. at 65, and (2) on May 19, 1994, Flint allegedly confirmed the agreement in a phone call to Litchard stating that "Falcon will know in about one week whether or not their deal goes through. If it does, ours does." *Id.* at 67–68. Details such as warranties, disclaimers, delivery, taxes, and allocation of risk of loss were not established nor even discussed. *Id.* at 72, 73. Furthermore, contingencies

and conditions existed on both ends; namely, Dassault Falcon Jet conditioned the sale upon the success of the Scott transaction and AIC seemingly conditioned the sale, according to the May 18, 1994 letter, on, among other things, a "pre-purchase survey," a "possible acceptance flight," and "the use of a purchase agreement." Parliman Cert., Exh. 4. *See Watson*, 934 F.Supp. at 661 (promise must be "clear and definite" as opposed to "conditional and contingent"); *Frutico, S.A. De C.V. v. Bankers Trust Co.*, 833 F.Supp. 288, 299 (S.D.N.Y.1993) ("no clear and unambiguous promise" where parties' negotiations made it clear that the agreement "was conditional upon the execution and delivery of a written contract").

■ Moreover, plaintiff has not established that Dassault Falcon Jet's promise induced definite and substantial detrimental reliance by AIC which would warrant the enforcement of an otherwise unenforceable agreement. First, and most importantly, the detriment AIC alleges must have occurred *because of AIC's reliance* upon Dassault Falcon Jet's promise. *See Malaker*, 163 N.J.Super. at 479, 395 A.2d 222. The record, however, reveals that AIC abandoned its negotiations with respect to the Orlando Citation III *before* any alleged promise was made by Dassault Falcon Jet. Bannister states in his deposition that, upon hearing from Morgan (*not* Dassault Falcon Jet)[8] that the Citation III–73 *might* (not would) be available, Bannister "dropped what [he] was doing, canceled the pre-purchase [on the Orlando Citation III] and got on a jet and flew to Idaho." Bannister Dep. at 42. Furthermore, nothing in the record suggests that even if AIC thought it was committed to purchasing the Citation III–73, it could not have also purchased the Orlando Citation III. The record reflects that in 1994 plaintiff was "looking for and trying to find ... two or three Citation IIIs ... to buy for inventory." *Id.* at 36.[9] Finally, AIC

---

8. Bannister never understood Morgan to be affiliated with Dassault Falcon Jet. *Id.* at 49–50.

9. Bannister asserts in a subsequent and inconsistent certification that AIC was only seeking to "inspect and consider two or three Citation IIIs in order to ultimately purchase one," Bannister

Cert. at ¶ 4. This court is somewhat skeptical, however, given that at his deposition Bannister not only made the statement quoted above concerning buying two or three Citation III's for inventory, but surmised that he was not in the office to take Flint's call on May 19, 1994—a call supposedly confirming a binding agreement en-

never asserts that it was unable financially to purchase two Citation IIIs during the same time period, having purchased a Citation III in San Paolo for $3.7 million in September or October 1994 and the Orlando Citation III for $3.55 million in October 1994. Bannister Dep. at 23, 25, 47.[10]

■ It is clear to this court that whatever the reason AIC chose not to purchase the Orlando Citation III in May 1994, it was not based on its reliance upon a promise, conditional and contingent at best, by Dassault Falcon Jet to sell it the Citation III–73. Assuming for purposes of this motion, however, that there was a clear and definite promise and further assuming that whatever damage plaintiff may have suffered is traceable to that promise (which, given the foregoing, is a stretch, to be sure), application of the equitable doctrine of promissory estoppel is still unwarranted.

■ "The essential justification for the doctrine of promissory estoppel is the avoidance of substantial hardship or injustice were the promise not to be enforced." *Malaker*, 163 N.J.Super. at 484, 395 A.2d 222. Even viewing the facts in the light most favorable to plaintiff, AIC has not established that it did or would incur substantial hardship much less injustice were the promise not enforced. There is no evidence that plaintiff expended significant resources in reliance on the promise. Plaintiff had not secured financing or borrowed money for the Citation III–73 thereby incurring interest expenses. Bannister Dep. at 38, 68–69. Plaintiff did not increase its warehouse space in anticipation of the new plane. *Compare Buddman Distribs., Inc. v. Labatt Importers, Inc.*, 91 A.D.2d 838, 839, 458 N.Y.S.2d 395, 396 (4th Dep't 1982) (plaintiff purchased vans and trailers and leased warehouse space in reliance on contract). Plaintiff had not secured a buyer for the Citation III–73 thereby incurring liability to a third party as a result of the breached promise. Bannister Dep. at 37,

74–75. No deposit was ever placed on the plane, Bannister Dep. at 71, and any out-of-pocket expenses plaintiff expended in flying to Idaho to survey the Citation III–73 were incurred before any alleged promise was made.

The only even arguable damage to which AIC points is that it "lost the opportunity to acquire another airplane because of its commitment to the defendant." Compl. at ¶ 15. But, as noted above, AIC abandoned the negotiations for that plane—the Orlando Citation III—before any promise was made by Dassault Falcon Jet and before even knowing whether the Scott deal would go through and, thus, any damages which flowed therefrom were not because of reliance on that promise. Moreover, AIC was able to purchase the Orlando Citation III, albeit at a slightly higher price. Even if one assumes that the slightly higher price was because of AIC's reliance on a breached promise, AIC has not suffered a detriment of such a "substantial nature" or an "injustice" which would justify the protection of promissory estoppel with the concomitant circumvention of the statute of frauds. *See Malaker*, 163 N.J.Super. at 479, 395 A.2d 222 (detriment must be of a "definite and substantial nature").

■ More is required of sophisticated business persons before there can be enforcement of a multi-million dollar deal or even minimal reliance damages than a phone call confirmed in writing by only an unrevised "letter of intent." "Such lax practices are precisely what the statute of frauds serves to minimize." *Columbus Trade Exchange, Inc. v. AMCA Int'l Corp.*, 763 F.Supp. 946, 956 (S.D.Ohio 1991). It is abundantly clear to this court that this is not a case where "injustice can be avoided only by enforcement of the promise." *Mazza*, 304 N.J.Super. at 560, 701 A.2d 723 (quoting *Restatement (Second) of Contracts*, § 139(1)).[11]

tered into the day before—because he was "out of town ... probably looking at another Citation III." *Id.* at 66.

10. Again, this court is unclear as to the specifics of the Orlando Citation III purchase because plaintiff's opposition brief states at page 19 that

the Orlando Citation III was purchased for $3.7 million "in or after August 1997."

11. Because promissory estoppel impinges upon accepted rules of contract formation, even courts which allow promissory estoppel to override the statute of frauds do so only in limited circum-

### III. *CONCLUSION*

For the above stated reasons, defendant's motion for summary judgment will be granted.

stances. *See, e.g., Hoffmann v. Boone,* 708 F.Supp. 78, 82–83 (S.D.N.Y.1989) (New York's standard for promissory estoppel requires that injury induced by party's reliance on promise be "unconscionable"); *Columbus Trade Exchange,* 763 F.Supp. at 955 (Ohio law dictates that promissory estoppel may only circumvent the statute of frauds when plaintiff establishes that "manifest inequity" would result if the statute were not bypassed).